**Jessie Leon PARKER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 41395.**

Court of Criminal Appeals of Texas.

July 24, 1968.

Browne & Moore by John J. Browne, Houston, (by appointment on appeal only), for appellant.

Carol S. Vance, Dist. Atty., James C. Brough and Erwin G. Ernst, Asst. Dist. Attys., Houston, and Leon B. Douglas, State's Atty., Austin, for the State.

## OPINION

WOODLEY, Presiding Judge.

The offense is murder; the punishment, 10 years.

The indictment alleged that on or about August 24, 1966, appellant, with malice aforethought, killed Helen Kelley "by drowning her in water and by holding her head under water until she suffocated."

The trial, which began on August 22, 1967, was before a jury on a plea of not guilty. The state did not seek the death penalty. The jury having found him guilty as charged, appellant elected to have the court assess the punishment.

Ground of error No. 1 complains that the evidence is insufficient to support the conviction, the principal contention being that there is no evidence or insufficient evidence to show that the death of Helen Kelley was caused by the criminal act of appellant or by criminal violence.

The state relied upon circumstantial evidence.

The evidence shows that on the evening of August 23, 1966, Helen Kelley (deceased) was drinking in Mary's Lounge. Ima Slater, who was also drinking, joined Mrs. Kelley at the Lounge, and at closing time Mrs. Kelley and Mrs. Slater left the Lounge with appellant and the three proceeded to a place in Harris County on the San Jacinto River, below Magnolia Gardens, for a picnic. They continued to drink wine on the way and all were intoxicated.

While Mrs. Slater was roasting weiners at the fire appellant had built, appellant said to Helen Kelley (who was in the car) "Let's go swimming, Helen, that's what we came here for," to which Helen Kelley replied, "Leon, you know I can't swim."

Appellant and the deceased then went down the river bank to a log imbedded in the sand which protruded out into deep water.

Mrs. Slater remained at the fire. She heard the murmur of voices and splashing, but no outcry or scream or commotion. The log could not be seen from the location of the fire.

After some 30 or 40 minutes appellant returned to the camp fire and told Mrs. Slater that he left Helen sitting on the log to come get her.

Mrs. Slater called "Helen" a number of times but received no answer.

Appellant made no explanation of Mrs. Kelley's disappearance except that "Helen" was so despondent "since Jack left her, she may have taken her life."

Mrs. Slater testified that appellant said something to the effect that they "were in this together," and testified in part:

"Q. Well, did he ask you to go swimming?

"A. Yes. He asked me to go swimming later but I said I'm not going in swimming because I can't swim.

"Q. And he said do you want it the easy way or the hard way?

"A. Yes, sir.

"Q. And you knew what he was talking about?

"A. No, sir.

"Q. Were you afraid?

"A. Yes, sir.

"Q. What of?

"A. Because I can't swim. I'm deathly afraid of water. I didn't want to go get in the water at night.

"Q. And that's all you were afraid of?

"A. No. *I thought if something happened to her, something might happen to me.* I guess I was thinking about my safety all the way through.

"Q. When did you first become afraid?

"A. The second time I asked him where was Helen and he said the second time she was sitting on the log and I just didn't hear any sounds and I didn't believe she was on any log. That's when I got afraid.

\* \* \* \* \* \*

"Q. Did he say poor thing, she's taken her life, or that she slipped in the river and we had better help her? Did anybody think about that or say anything about that?

"A. The only thing I said was Let's go. That's all I wanted to do to see if we could report it or somthing.

"Q. What were you going to report?

"A. Well, she was missing. I didn't hear her or see her and she came out with us.

\* \* \* \* \* \*

"Q. Did you ever tell Mrs. Whickliff why you were crying?

"A. I don't remember. I told her something terrible had happened. I was so shook up I just broke when I got to her house. I don't think she believed it. I was just babbling.

"Q. What did you tell her?

"A. I told her something terrible happened. The three of us went to the river and she came up missing. I don't know what I said. I was just panicky."

Mrs. Slater further testified that on the way back to town appellant threw something out of the car.

When she accompanied officers to the camp site the next day the officers found Helen Kelley's dress and other clothing along the road to the camp site.

Mrs. Louise Whickliff testified that about 9:30 the morning Helen Kelley was drowned she saw a man drive Mrs. Slater to a vacant house next door to her home. Mrs. Slater got out of the car and she (the witness) went outside and called her and she came in.

She testified:

"Q. What did she do as soon as she got in your house?

"A. She went into the bathroom and she come out and started crying and said she was scared.

"Q. Was she crying loud or how was she crying—describe how she looked and acted.

"A. She wasn't crying loud but like she was kind of hysterical.

"Q. Like she was hysterical, and did she say she was scared at that time?

"A. Yes.

\* \* \* \* \* \*

"Q. Without going into what she said, did she say who she was afraid of?

"A. She said the man she got out of the car. She didn't say the man.

\* \* \* \* \* \*

"Q. (By Mr. Ernst) Did she or not tell you she was hiding from the man?

"A. (By Witness) She asked me to tell him she wasn't there.

\* \* \* \* \* \*

"Q. (By Mr. Ernst) Did you have a conversation with her relating to what happened that night?

"A. (By Witness) Yes, we did—

"MR. CANESSA: We object. to that question relating to what happened. I think it's a vague question. I still think it's bordering on a fishing expedition.

"THE COURT: I sustain the objection at this time."

On cross-examination she testified:

"Q. You knew the lady pretty well. How do you account for the fact that she had been to your house on these occasions and had never gone to the house next door? Why would she have gone to that house that morning?

"A. She said she was trying to get away from the man.

"Q. But she wasn't too drunk to know where she was going?

"A. No, she wasn't."

Helen Kelley's nude body was found floating face down in the San Jacinto River about 9:30 or 10 A.M. on August 24, 1966.

The post mortem examination performed by Dr. Jachimczyk, Harris County Medical Examiner, which began about 1 P.M. on August 24, 1966, took several hours and Dr. Jachimczyk's testimony described to the court and jury in detail the external examination and internal dissection and laboratory analysis and his findings from which he formed the opinion that Helen Kelley died as the result of suffocation from drowning within an hour or two of 1 o'clock A.M. on August 24, 1966.

Dr. Jachimczyk testified in part:

"Q. And you also examined completely the internal portions of this woman, did you not?

"A. Yes, sir.

"Q. Tell the jury whether there was any significant findings inside the body that shed a light upon how she met her death.

"A. Yes, sir. The most significant internal anatomic changes are those present in drowning, namely, the dark fluid unclotted blood, the congestion of the viscera which means water lodging over tissues of the body. The pulmonary edema which is also water on the lungs, and the peticial hemorrhages which are the result of lack of oxygen in the water the person breathes. Those are the internal findings as far as the drowning aspect is concerned. In addition, however, there were fresh recent hemorrhages into the so-called strap muscles. The strap muscles is that muscle on either side of the neck that make the head turn. There were hemorrhages on either side of the neck into these muscles. Also hemorrhage down behind the clavicle or collarbone and these were—

and also extended from this outside discoloration we mentioned on the neck, and *this type of hemorrhages are the result of something or someone restraining this portion of the anatomy and an individual resisting this restraint.*

"Q. You have two conclusions. Unquestionably this woman met her death because her lungs were filled with water, is this correct?

"A. That is correct.

"Q. *And there was severe force placed by someone against the strap muscles on either side of this woman's neck?*

"A. *That is correct.*

"Q. Is there any doubt at all in your mind about that?

"A. No, sir."

* * * * * *

(On re-direct examination)

"Q. Have you performed an autopsy on few or many of these strangulation by hand type of cases?

"A. Many cases.

"Q. Is the—are the marks left by hand strangulation, is there a pattern, in your professional judgment, that would follow?

"A. Yes, sir.

"Q. Is this a classic hand pattern?

"A. These are symmetrical type hemorrhage seen when the upper part of the body is restrained by hand.

"Q. In all medical probability based on your experience of having seen many, many strangulation cases, these were similar to those?

"A. Yes, sir.

"Q. And in all probability then in that manner?

"A. Yes, sir."

Deputy Sheriff Eddie Knowles, who assisted in recovering the body from the river and took pictures at the river and in the morgue, testified in part:

"Q. After determining who it was that was dead, did you participate any further in the investigation as to the party who was indicted for this offense?

"A. No, sir. I had nothing more to do outside of putting out a pickup on him and the F.B.I. helping us.

"Q. Do you know how long it was before he was apprehended?

"A. I don't know how long it was. I know a good lapse of time. We kept missing him.

"Q. But you didn't do anything but send out an A.P.B.?

"A. Yes, sir.

"Q. And a good time later he was apprehended in another county?

"A. Yes, sir, that's correct."

Deputy Sheriff John Conley, who accompanied Mrs. Slater to the camp site and found the dress and clothing, testified that he examined the camp site and log and waded in the water by the log; that there were no branches on the log and no snags or logs on which a person who was standing there drunk would be likely to catch his or her neck.

Deputy Conley also testified:

"Q. Do you recall if this investigation occurred on the day after the body was found? It would have been August, I guess the 25th. When was this defendant arrested?

"A. He was arrested February 1st, 1967.

"Q. And where?

"A. In Vidor, Texas.

"Q. Where is that, sir?

"A. Well, that's near Beaumont. It would be out Highway 73.

"Q. That would be six months later?

"A. Yes, sir.

"Q. Do you know when a complaint was filed against this individual and a warrant issued for him, whether or not it was in the month of August?

"A. I believe it was. I'm not positive of the dates."

(The transcript of the record of the Texas Department of Public Safety concerning the appellant, introduced without objection at the hearing before the court on the punishment issue, reflects, in addition to the felony convictions stipulated and a number of misdemeanor convictions, "wanted: 12–13–66, as Jessie Leon Parker for murder. Notify SO, Houston, Texas. 2–3–67 Canc. auth. SO, Houston, Texas.")

This court must view the circumstantial evidence in the light most favorable to the jury's verdict in passing upon its sufficiency. Blankenship v. State, 167 Tex. Cr.R. 192, 319 S.W.2d 107; Franklin v. State, 147 Tex.Cr.R. 636, 183 S.W.2d 573.

■■■ The credibility of the witness Ima Slater and the reasonableness of her testimony was for the jury.

"Very wisely the jury has been made the exclusive judges of the facts proven and the weight to be given to the testimony * * * this court does not, and should not, assume to exercise the right to reverse on the facts, unless the evidence, when viewed in its strongest light from the standpoint of the state, fails to make guilt reasonably certain. * * *" (Quote from Mason v. State, 1 S.W.2d 283, at p. 284.)

"While this court has the right to reverse a judgment of conviction on account of the insufficiency of the evidence (Texas Code Crim. Procedure, art. 939) and it becomes its duty to do so 'if the guilt of the accused is not made to appear with reasonable certainty' (Mit-chell v. State, 33 Tex.Cr.R. [575] 577, 28 S.W. 475), no fixed rule has been devised which will in all cases furnish a certain standard. Necessarily each case must in a measure be tested by its own facts (Mitchell v. State, 33 Tex.Cr. R. [575,] 577, 28 S.W. 475; Hampton v. State, 1 Tex.App. 652; Burrill on Circumstantial Evidence, p. 737; Wills on Circumstantial Evidence, p. 188). However, when a jury, advised of the restrictions which the law places upon them in condemning one on circumstantial evidence, reaches the conclusion upon evidence properly before them that the accused is guilty, it is not for the reviewing court to supplant their findings by its own, unless it is able to point to weaknesses, omissions, or inconsistencies in the evidence which destroy its cogency. This, in the instant case, we are unable to do." (Quote from Taylor v. State, 87 Tex.Cr.R. 330, 221 S.W. 611, at pages 613 and 614.)

■■ The evidence viewed in the light most favorable to the jury's verdict is sufficient to prove the corpus delicti and to sustain the conviction.

The second ground of error complains of the admission in evidence of "gory color photographs."

■■ The record reflects that in response to the inquiry of the court, when the photographs were offered by the state, appellant's trial counsel answered that there was no objection.

The ground of error is overruled. Watkins v. State, Tex.Cr.App., 411 S.W.2d 364.

The remaining ground of error complains of the failure of the trial court to include in his charge a definition of murder without malice and an application of such law to the facts of the case.

■■ The evidence did not raise an issue as to a killing in the heat of passion arising from an adequate cause, and there was

no objection to the charge and no requested charge. The ground of error is overruled. Arts. 36.14–36.19 Vernon's Ann. C.C.P.

The judgment is affirmed.

ONION, Judge (dissenting).

"In criminal cases, the guilt of the accused must be proved beyond a reasonable doubt. In other words, a conviction in a criminal case cannot be sustained if the evidence leaves any reasonable doubt as to guilt of the accused.

"No exact rule exists for determining in each case what constitutes reasonable doubt. On the contrary, what constitutes reasonable doubt in a particular case must necessarily be determined by the facts of the case. To sustain a conviction, however, two things are essential. First, it must be shown that the offense charged was actually committed. Second, there must also be proof, of a degree of certainty greater than a mere possibility or strong suspicion, that tends to show that the accused was the person who either committed the crime or else participated in its commission." 24 Tex. Jur.2d, Evidence, Sec. 724, p. 393.

"In criminal cases, a conviction may properly be had on circumstantial evidence alone. Indeed, circumstantial evidence is frequently just as convincing in a criminal case as direct evidence. To sustain a conviction on circumstantial evidence, however, the basic facts from which it is sought to infer the ultimate fact of guilt must be proved beyond a reasonable doubt by direct evidence. The basic facts must also be consistent not only with each other, but also with the ultimate fact of guilt sought to be inferred from the basic facts. In short, the circumstances relied on, when considered as a whole, must be of a conclusive nature; they must lead to a satisfactory conclusion that the accused is guilty and exclude all other reasonable hypotheses except guilt. They must pro-

duce, in net effect, a reasonable and moral certainty that the accused and no other person committed the offense charged." 24 Tex.Jur.2d, Evidence, Sec. 729, p. 403.

"In criminal cases, a judgment of conviction, to be sustained on appeal, must be supported by evidence that produces a moral certainty of the guilt of the accused to the exclusion of every reasonable doubt. The evidence will be insufficient to sustain the conviction where, although not leaving the accused free from suspicion of guilt, it still fails to show his guilt to a moral certainty, so as to exclude all reasonable doubt.

"In ascertaining whether the guilt of the accused has been established to a moral certainty, the appellate court will review the evidence in light of the presumption that the accused is innocent. The Court will not presume any acts against the accused that are not shown to have been committed by him. Furthermore, a conviction will not be sustained on appeal if the evidence does not sufficiently establish all material elements of the offense charged." 24 Tex.Jur. 2d., Evidence, Sec. 742, p. 422.

The facts in this case must be examined in light of these well established rules:

The evidence shows that Helen Kelley, the deceased, a woman in her late forties or fifties who was separated from her husband Jack, spent practically every day in Mary's Lounge buying drinks or "mootching" drinks. August 23, 1966, was no exception. On that evening at approximately 10:30 p. m. the deceased, a woman named Louise and the appellant were joined by Ima Slater, the State's principal witness. Ima Slater had been drinking whiskey all day with her common law husband, John Cook. When he fell asleep she adjourned to Mary's Lounge and there joined the threesome. Because of her inebriated condition, she was refused service at the lounge but drank whiskey from appellant's partially filled bottle.

At the lounge's midnight closing time, the appellant and the three women left together. After taking Louise home it appears the appellant suggested that they go for a picnic and a swim, and after purchasing groceries they proceeded to a place on the San Jacinto River near Magnolia Gardens, which is described in the record as a tavern-cafe or dance hall. There at a picnic site a quarter of a mile from such tavern in a wooded area with fishing camps in the near vicinity, appellant built a fire. As noted in the majority opinion, they had all continued to drink wine on the way and were intoxicated. While Mrs. Slater was roasting wieners at the fire appellant had built, appellant suggested to the deceased who had remained in the car that they go swimming, to which she replied, "Leon, you know I can't swim." He is then reported to have said, "Let's go swimming, you need a bath anyway." Mrs. Slater related that appellant "was sort of teasing her." (Helen) Mrs. Slater stated that she did not see what apparel the deceased and the appellant wore when they left to go down to the river bank to a log embedded in the sand because she had her back to them. From her position at the campfire Mrs. Slater was unable to see the log in the river, but she did hear voices laughing, giggling, talking, and some splashing of water. She heard no outcry, scream or commotion. She related that this continued for 30 or 40 minutes, until appellant returned to the fire and told her that he had left Helen sitting on the log and asked her to join them. Mrs. Slater then called "Helen" a number of times but received no answer, and then she and appellant went halfway down to the river but Mrs. Slater retreated because she was afraid of the water and could not swim.

It is true that Mrs. Slater testified that appellant said something to the effect that they "were in this together," but the following is her exact testimony on the subject:

"Q. What did he say after you called and she didn't answer?

"A. I believe he said something about we are in this together. I said what together and I said let's go, if something happened, let's go away. I can't remember just everything. I was so panicky.

"Q. You do know he said we're in this together?

"A. Yes.

"Q. What did you say?

"A. I don't remember.

"Q. What did he say?

"A. I guess he was referring if she took her life or if she drowned accidentally."

After their unsuccessful endeavor to locate the deceased, Mrs. Slater and the appellant remained by appellant's automobile for approximately 4 hours. At dawn they left and stopped at a coffee shop on the Beaumont highway to get coffee, but Mrs. Slater made no outcry to the proprietor, waitress or other people present.

Mrs. Slater revealed that on the way back to town appellant threw something out of the car, but admitted that she didn't know what it was and had assumed it was "bottles." She did not see appellant throw any clothing out of the car. She did not testify that she saw any of the deceased's clothing in the car or at the campsite after the deceased's disappearance, nor did she reveal at what point on the trip back to town she had seen appellant throw something from the car. Subsequently, appellant took her to the home of a friend (Mrs. Whickliff) whom she had met when both were confined in jail on charges of drunkenness, but she did not report the incident at the river to the police. Mrs. Slater admitted that her recollection of the entire incident was hazy. It was shown that she had been convicted of the felony offense of driving while intoxicated, and had been committed to the Austin State Hospital as an alcoholic both before and after the alleged offense.

The following day after the officers had taken Mrs. Slater to Magnolia Gardens, she was able to direct them to the campsite and the log in the river. Without her assistance the officers discovered what appeared to be the deceased's dress (and slip) and shoes at points 9/10 of a mile and 1/2 of a mile from the campsite on a public road accessible to all who entered or left the area. She testified that she did not remember "how we came out or in." The deceased's panties, hose and brassiere were never found.

Deputy Sheriff Conley did testify that he waded knee-deep in the water by the log, but he did not examine the last five or six feet of the log extending into deep water to determine whether there were branches on the log, snags or logs on which a person standing or sitting there drunk would be likely to catch his or her neck. Further, he did not testify that he examined the ground surrounding the log to determine if there were footprints leading off in an opposite direction than the campsite.

Helen Kelley's nude body was found floating face down in the San Jacinto River about 9:30 or 10 a. m. on August 24, 1966, approximately three or four hundred yards south of Magnolia Gardens Tavern, a quarter of a mile from the campsite in question. The autopsy performed revealed that at the time of her death, the alcohol content in her blood was .310 or, as the medical examiner pointed out, she was more than three times drunk.

The medical examiner further testified that there were some recent hemorrhages into the strap muscles of the neck, and that "this type of hemorrhages are the result of *something or someone* restraining this portion of the anatomy and an individual resisting this restraint." * * * "That something or someone had applied force to that portion of the anatomy." Further, he related "[s]omething either hits the body or the body hits something is one way this can occur and another is that if the body, certain portions of the body are restrained and force applied to break that restraint and there are forces at work. This can be caused by both." The medical examiner did express the opinion that the force applied to the strap muscles was similar to those seen in strangulation cases but testified the same bruises could be produced if someone was trying to save a person from drowning and grabbed the person's neck.

The medical examiner further testified that the deceased did not die of strangulation as such, but died as a result of suffocation from drowning. He further related that while it was his opinion that she died within an hour or two of 1 a. m., there was the possibility that she could have died at any time from 1 a. m. until her body was found. He explained that some of the bruises found on her body could have been caused by logs or driftwood in the river.

It is true that the appellant was arrested some six months later in Vidor near Beaumont, but there is meager evidence to indicate flight. There is no showing that he did not live or work there at the time and the record indicates that he was seen in Mary's Lounge sometime after the alleged offense, and there is no showing that he departed Harris County suddenly after the alleged offense. It is observed that after the deceased's disappearance he remained at the campsite four hours to await her re-appearance despite Mrs. Slater's plea of "Let's go."

The appellant did not testify but offered the testimony of his sister-in-law, who stated that she knew the deceased who had stayed with her on one occasion because she had no place else to go and had been sleeping in parked cars. The sister-in-law testified that the deceased was always stumbling and falling down from drinking. Appellant further offered the testimony of another witness who frequently bought the deceased drinks at Mary's Lounge just to keep her from bothering him.

It further appears to have been common knowledge among the deceased's acquaintances and friends that she was despondent

over her year old separation from her husband.

The evidence fails to reflect any motive on the part of the appellant. They had no quarrel or argument at the lounge, nor at the picnic site. Mrs. Slater heard no sounds of any struggle or outcry or scream, and she further testified that appellant and the deceased had always been good friends.

It is well settled that a showing or lack of a showing of a motive for the crime is a factor to be weighed in determining whether the evidence is sufficient to produce moral certainty of the accused's guilt.

Can it be said that it has been shown beyond a reasonable doubt that the deceased met her death as a result of a criminal act? If that has been shown, is there proof of a degree of certainty greater than a mere possibility or strong suspicion that tends to show that the accused is the person who committed the crime? I think not, even if we consider the hysterical hearsay statements of the admitted alcoholic Slater, set out and relied upon in the majority opinion, as to her suspicions, fears and feelings. Are the circumstances sufficiently strong to exclude the reasonable hypothesis that the 3-times-drunk deceased did not either accidentally or purposefully fall off the log into water and was swept to her death against logs and debris in the river, or that she wandered off in search of Magnolia Gardens or one of the various nearby fishing camps in order to "mootch" another drink and there met her death at the hands of parties unknown?

I cannot conclude that the facts set forth above, upon which this conviction rests, are sufficiently strong to exclude every reasonable hypothesis except the guilt of the accused even when considered in the light most favorable to the jury's verdict. See Hodges v. State, 167 Tex.Cr.R. 490, 321 S.W.2d 307.

I respectfully dissent.

MORRISON, J., joins in this dissent.