James Eugene BIGBY, Appellant,

v.

The STATE of Texas, Appellee.

No. 71234.

Court of Criminal Appeals of Texas.

Nov. 2, 1994.

David L. Richards, Michael Logan Ware, Fort Worth, for appellant.

Tim Curry, Dist. Atty., and Charles M. Mallin & Robert Mayfield, Asst. Dist. Attys., Fort Worth, Robert Huttash, State's Atty., Austin, for the State.

*OPINION*

MEYERS, Judge.

Appellant was found guilty of capital murder on March 12, 1991, for the murder of a father and his infant son. Tex.Penal Code. Ann. § 19.03(a)(6) (West 1990). The jury affirmatively answered the submitted special issues, and the trial court sentenced appellant to death. Tex.Code Crim.Proc.Ann. art. 37.071(b) (West 1990). Appeal to this court is automatic. Tex.Code Crim.Proc.Ann. art. 37.071(h) (West 1990). We will affirm.

## I. SUFFICIENCY OF THE INSANITY DEFENSE

In the first point of error, appellant contends the jury's rejection of his insanity defense at trial was so against the great weight and preponderance of the evidence as to be manifestly unjust. At trial a criminal defendant has the burden to prove his insanity by a preponderance of the evidence and, in this case, appellant mounted a considerable insanity defense. Tex.Penal Code Ann. § 8.01(a) and § 2.04(d); *Meraz v. State*, 785 S.W.2d 146, 154 (Tex.Crim.App.1990). The State argues that this Court does not have the power to conduct a factual review of this nature, and in the alternative, that the evidence is not so against the great weight and preponderance so as to be manifestly unjust.

## A. JURISDICTION

We begin with the State's jurisdictional argument. In support of its argument the State cites to *White v. State*, 591 S.W.2d 851, 855 (Tex.Crim.App.1979), a case heavily relied upon by this Court in *Meraz, supra*. In *White* the appellant asked our Court to review the jury's competency finding and to set aside that finding if we concluded it was against the great weight and preponderance of the evidence. In rejecting the appellant's invitation we explicitly stated that we did not have the power to review questions of fact as the then courts of civil appeals could. *White*, 591 S.W.2d at 855.[1] Our conclusion that we lacked the power to review such questions

---

1. Interestingly, the opinion in *White* appears to conflict with this Court's opinion in *Graham v.*

*State*, 566 S.W.2d 941 (Tex.Crim.App.1978) (en banc), a case in which the Court, only a year

was based upon the peculiar provisions of the Texas Constitution.[2]

The jurisdiction of this Court is governed by Article V, Section 5 of the constitution. It provides:

> The Court of Criminal Appeals shall have final appellate jurisdiction coextensive with the limits of the state, and its determinations shall be final, in all criminal cases of whatever grade, with such exceptions and under such regulation as may be provided in this Constitution or as prescribed by law.

> The appeal of all cases in which the death penalty has been assessed shall be to the Court of Criminal Appeals....

Section 6 of the same article of the Texas Constitution grants the Courts of Appeals jurisdiction, providing:

> ... Said Court of Appeals shall have appellate jurisdiction co-extensive with the limits of their respective districts, which shall extend to all cases of which the District Courts or County Courts have original or appellate jurisdiction, under such restrictions and regulations as may be prescribed by law. *Provided, that the decision of said courts shall be conclusive on all questions of fact brought before them on appeal or error.* Said courts shall have such other jurisdiction, original and appellate, as may be prescribed by law.

[Emphasis added.] The emphasized clause of Section 6 has been referred to as the "factual conclusivity" clause.

The Court in *White* was interpreting Article V, Section 6 prior to the 1980 Amendment when only the civil system had intermediate appellate courts. The Court held that, "this Court has no jurisdiction to do what appellant requests as would a Court of Civil Appeals because of a somewhat peculiar [factual conclusivity] provision applicable to the Court of Civil Appeals." *White,* 591 S.W.2d at 855. The 1980 Amendment to this section of the constitution changed the Courts of Civil Appeals to the Courts of Appeals and granted those courts criminal appellate jurisdiction. In *Meraz* we held that *White* was still applicable *stare decisis* and further that the "factual conclusivity" clause was a *grant* of fact jurisdiction to the courts of appeals. *Meraz,* 785 S.W.2d at 155. In this we erred. *White v. State,* 591 S.W.2d 851, incorrectly interpreted the "factual conclusivity" doctrine as a grant of fact jurisdiction. This is evidenced by both a historical perspective of the adoption of the "factual conclusivity" clause and criminal jurisprudence in this State from the days of the Republic to the 1960's.

The constitution grants the courts of appeals and our Court "appellate jurisdiction" in Sections 6 and 5 of Article V, respectively. This is a general grant of jurisdiction which is the basis for all appeals from lower to superior courts in Texas. Procedurally, an "appeal" is a review by a superior court of an inferior court's decision. *White v. State,* 543 S.W.2d 366, 368 (Tex.Crim.App.1976); *Republic v. Smith,* Dallam 407, 409 (Tex. 1841); Black's Law Dictionary 712 (5th Ed.1983). In 1841 the Supreme Court of the Republic delineated the scope of "appellate jurisdiction" in Texas:

---

earlier, conducted a factual review of appellant's insanity defense. In *Graham,* the Court examined the evidence of insanity to determine whether it was against the great weight and preponderance of the testimony. The Court determined it was not and upheld the appellant's conviction.

**2.** Our jurisdiction and that of the courts of appeals has become confused as a result of the inharmonious interpretations of Article V, section 6, by our Court and our Brethren on the Texas Supreme Court. This divergence of opinion has caused considerable bewilderment among our courts of appeals. Susan Bleil & Charles Bleil, *The Court of Criminal Appeals Ver-* sus the Constitutional Question: The Conclusivity Clause, 23 St. Mary's L.J. 423, 442–449 (1991); *Meraz v. State,* 714 S.W.2d 108 (Tex.App.—El Paso 1986) ("The courts of appeals are caught in a conflict between those holdings of the Court of Criminal Appeals and the legion of cases to the contrary by the Supreme Court of Texas."), aff'd, 785 S.W.2d 146 (Tex.Crim.App.1990); *Minor v. State,* 653 S.W.2d 349, 351 (Tex.App.—San Antonio 1983, pet. ref'd) (Cadena, C.J., concurring) (Our opinion that the court of appeals lacked jurisdiction to conduct a factual review of the evidence was a clear misinterpretation of the constitution).

An appeal is a process of civil law origin, and removes a cause entirely, subjecting the fact as well as the law to a review and retrial. A writ of error is a process of common law origin, and it removes nothing for re-examination but the law.

*Bailey v. Haddy*, Dallam 376 (Tex.1841). Later that same year, the Supreme Court of the Republic addressed its criminal "appellate jurisdiction."

It is our opinion, then, that the [constitutional] convention intended only to adopt the common law, to use their own language, "as a rule of decision" in criminal proceedings; and no more of the forms and peculiar writs of that code than might be found necessary to carry out the objects contemplated by that adoption. And surely the convention never intended, when they inserted in the constitution a provision creating an appellate court in criminal as well as civil cases, to deny the accused who might wish to appeal from the district court to the supreme court the right of having the facts of his case, as well as the law, opened to re-examination. We cannot believe it. We decide, then, that the defendant in a criminal prosecution in the district court has the right of appeal to this court from the judgment or sentence of the court below, and to have the facts as well as the law, at his own election, opened for re-examination.

*Republic v. Smith*, Dallam 407, 410–411 (Tex. 1841). In 1875, the Supreme Court of the State of Texas also recognized that "appellate jurisdiction" conferred upon the superior court authority to revise the facts of a criminal case.

In harmony with and in pursuance of this construction of the import thus given to the terms appellate jurisdiction, all of our subsequent constitutions have expressly given to the Supreme Court jurisdiction of criminal as well as civil cases as an appellate tribunal, and statutes have been passed providing means by which the court should be enabled to exercise its full power of revising a criminal cause upon the law and facts as presented in the record.

*Bishop v. State*, 43 Tex. 390, 400 (1875).

In 1891 the State amended the 1876 Texas Constitution and created the courts of civil appeals. Tex. Const. Art. V, § 6 (1876). In that provision, the courts of civil appeals were granted "appellate jurisdiction," which meant that an appeal brought both the facts and the law of a case for review. *Bailey, supra; Smith, supra; Bishop, supra.* However, after the general grant of jurisdiction the Framers added what has become known as the "factual conclusivity" clause. The clause states: "Provided, that the decision of said courts shall be conclusive on all questions of fact brought before them on appeal or error." Tex. Const. art. V, § 6. The Supreme Court interpreted this provision as a limit, not on the court of civil appeals, but upon their own jurisdiction. *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 648 (Tex.1988); *Pool v. Ford Motor Co*, 715 S.W.2d 629, 633 (Tex.1986); *Traylor v. Goulding*, 497 S.W.2d 944, 945 (Tex.1973); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951); *Choate v. San Antonio & A.P. Ry.*, 91 Tex. 406, 44 S.W. 69 (1898).[3] The clause itself lends support to this interpretation. By stating that "[p]rovided that the

---

**3.** In civil cases, a court's of appeals *factual* finding is final and is not subject to review by the Supreme Court. *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 648 (Tex.1988); *Pool v. Ford Motor Co*, 715 S.W.2d 629, 633 (Tex.1986); *Traylor v. Goulding*, 497 S.W.2d 944, 945 (Tex. 1973); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951); *Choate v. San Antonio & A. P. Ry.*, 91 Tex. 406, 44 S.W. 69 (1898). In a civil case, the courts of appeals have the power to review "factual insufficiency of the evidence" or "against the great weight and preponderance of the evidence" points of error. *Cropper*, 754 S.W.2d at 651. The courts of appeals determina-

tion on these points is final as to the facts. *Cropper*, 754 S.W.2d at 648. However, both the courts of appeals and the Texas Supreme Court have the power to review "no evidence" points because such a question is a question of *law* and not of *fact*. *Choate*, 44 S.W. at 69.

Our jurisdiction in discretionary cases would appear identical to the Texas Supreme Court's writ of error jurisdiction. It logically follows that, absent an opposite reading of the Texas Constitution, our Court is also bound by factual determinations by the courts of appeals. Tex. Const. art. V, § 6. That is, a court of appeals determination of "factual insufficiency" or

decision of said court shall be conclusive" on fact questions, the clause seems to presuppose that the court already possesses the power to conduct factual review. This is buttressed by the historical meaning of "appellate jurisdiction."

In the civil system after the 1891 amendments, the losing party in a civil suit appealed first to the court of civil appeals. This was a *direct appeal* and a matter of right. Because the court of civil appeals had "appellate jurisdiction" to consider the appeal, the complaining party could seek a factual or legal review of his case. The court of civil appeals, like the trial court, had the power to set aside a factual finding by the jury. *Choate,* 91 Tex. 406, 44 S.W. at 69.[4] Any determination by the court of civil appeals concerning questions of fact were final and binding upon the Texas Supreme Court. *Ibid.* Questions of law decided by the court of civil appeals could be appealed via a writ of error to the Supreme Court. However, determination of the court's of civil appeals on the question of fact was final because of the "factual conclusivity" doctrine. *Ibid.* As the Supreme Court stated in *Choate,*

> The supreme court, before the amendments in question, had jurisdiction on appeal or a writ of error over the facts of a case, but to this extent only; that, if the evidence was conflicting upon any material issue, it could sustain the verdict and affirm the judgment; or if, in their opinion, the verdict was against such a preponderance of the evidence as to justify such action, it could set it aside, and remand the cause for new trial. It had no power to make an original final determination of fact. It might approve the finding of the jury, and thus make it conclusive. This same power is conferred by the amend-

ments to the court of civil appeals, and their action upon such questions is made final, and not subject to review by this court.

44 S.W. at 70. Essentially, in the civil system factual review may be conducted only to the direct appellate court.

In 1891 this Court was created and given final "appellate jurisdiction" over criminal law matters. Tex. Const. art. V, § 5 (1891 Amendment). For ninety years this Court was the exclusive criminal appellate court in Texas. In 1980 the Constitution was again amended changing the courts of civil appeals to the courts of appeals and giving those courts jurisdiction over criminal law matters.

While the Supreme Court and the Courts of Civil Appeals had consistently held that the general grant of "appellate jurisdiction" allowed the direct appellate court to review questions of fact, our Court had wavered in the late 1970's and through the 1980's. *See White v. State,* 591 S.W.2d 851; *Combs v. State,* 643 S.W.2d 709 (Tex.Crim.App.1982), overruled; *Van Guilder v. State,* 709 S.W.2d 178 (Tex.Crim.App.1986), *overruled;* and *Schuessler v. State,* 719 S.W.2d 320 (Tex. Crim.App.1986), *overruled.* This Court held in *White* that the constitution granted the courts of civil appeals fact jurisdiction in the "factual conclusivity" clause, rather than from the courts of civil appeals general grant of authority. 591 S.W.2d at 855. In *Meraz* we extended this holding to the courts of appeals. 785 S.W.2d at 155. However, as is illustrated from the historical developments in the late 1800's and the creation of the "factual conclusivity" clause, it was not this clause that generated the court's fact jurisdiction but rather the general jurisdictional grant.

"against the great weight and preponderance of the evidence" points of error is final in criminal cases, absent an error by that court on the applicable law. *Meraz,* 785 S.W.2d at 154.

However, unlike our brethren we also have appellate jurisdiction that is non-discretionary; that is, cases in which the appeal is directly to this court. Tex. Const. art. V, § 5; Tex.Code Crim.Proc.Ann. arts. 37.071, § 2(h) and 37.0711, § 3(j).

4. Where there was no evidence to support the jury's finding the proper remedy was to reverse the jury's finding and enter a judgment in favor of the complaining party. *Choate,* 44 S.W. at 69. However, where there was a conflict in the evidence the proper remedy was to reverse the jury's finding and award a new trial. *Ibid.*

Not only did *White* misconstrue the "factual conclusivity" clause, but it failed to recognize considerable jurisprudence by this Court and our predecessors with criminal jurisdiction which had continually recognized the authority, though infrequently exercised, of the State's highest criminal court to review a case upon the facts as well as the law. *See e.g., Republic v. Smith,* Dallam 407 (Tex. 1841); *Bishop v. State,* 43 Tex. 390, 399–400 (1875); *Tollett v. State,* 44 Tex. 95 (1875); *Loza v. State,* 1 Tex.App. 488 (1877); *Montgomery v. State,* 16 S.W. 342 (Tex.App.1891); *Mitchell v. State,* 33 Tex.Cr.R. 575, 28 S.W. 475 (1894); *Murphy v. State,* 65 Tex.Cr.R. 55, 143 S.W. 616, 620 (1912); *Smith v. State,* 85 Tex.Cr.R. 355, 212 S.W. 660, 661 (1919); *Jolly v. State,* 87 Tex.Cr.R. 288, 221 S.W. 279, 281 (1920); *Cook v. State,* 228 S.W. 213, 216 (1921) (on rehearing); *Vogel v. State,* 89 Tex.Crim. 474, 231 S.W. 1096, 1096–1097 (1921); *Rochetszky v. State,* 94 Tex.Crim. 423, 251 S.W. 232, 233 (1923) (on rehearing); *Green v. State,* 97 Tex.Crim. 52, 260 S.W. 195 (1924); *Claxton v. State,* 105 Tex.Crim. 308, 288 S.W. 444, 447 (1926) (on State's motion for rehearing); *Mason v. State,* 108 Tex. Crim. 452, 1 S.W.2d 283, 284 (1928) (on rehearing); *Powell v. State,* 116 Tex.Crim. 34, 28 S.W.2d 142 (1930); *Stevens v. State,* 121 Tex.Crim. 511, 50 S.W.2d 284 (1931); *Davis v. State,* 125 Tex.Crim. 6, 66 S.W.2d 343 (1933); *Armistead v. State,* 130 Tex.Crim. 501, 94 S.W.2d 1161 (1936); *Ralston v. State,* 133 Tex.Crim. 100, 109 S.W.2d 185 (1937); *Ballard v. State,* 136 Tex.Crim. 188, 124 S.W.2d 131 (1939); *Lozano v. State,* 138 Tex. Crim. 549, 137 S.W.2d 1031, 1032 (1940);

*Villareal v. State,* 140 Tex.Crim. 675, 146 S.W.2d 406, 409–410 (1941); *Franklin v. State,* 147 Tex.Crim. 636, 183 S.W.2d 573, 574 (1944); *Lozano v. State,* 154 Tex.Crim. 229, 226 S.W.2d 118 (Tex.Crim.App.1950); *Parker v. State,* 432 S.W.2d 526 (Tex.Crim.App. 1968).

This evidentiary review has included reviews of cases in which a defendant has presented the affirmative defense of insanity. *See e.g., Holmes v. State,* 20 Tex.App. 110 (1885); *Kiernan v. State,* 84 Tex.Cr.R. 500, 208 S.W. 518, 519 (1919); *Gardner v. State,* 85 Tex.Cr.R. 103, 210 S.W. 694 (1919); *McCann v. State,* 129 Tex.Cr.R. 105, 83 S.W.2d 967, 972 (1935) (on second rehearing); *Graham v. State,* 566 S.W.2d 941 (Tex.Crim. App.1978) (en banc); *but see Hernandez v. State,* 157 Tex.Crim. 112, 247 S.W.2d 260, 261 (1952) (question for jury not to be disturbed if evidence to support it); *Ross v. State,* 153 Tex.Crim. 312, 220 S.W.2d 137, 144 (1948) (sole province of jury to believe or not believe a defendant's defensive theory of insanity).

The ability to review the facts of a case has also been consistently recognized by the Legislature. Article 44.25 of the Code of Criminal Procedure provides that the "courts of appeals or the Court of Criminal Appeals may reverse the judgment in a criminal action, as well upon the law *as upon the facts.*" (Emphasis added.) This provision of the Code has remained almost identical since 1857 with each subsequent code giving the State's criminal appellate courts the power to reverse a criminal case upon the facts.[5]

Clearly under either the statute or the constitution we are empowered to review

---

5. This provision of the Code of Criminal Procedure has remained virtually unchanged since 1857 when the Texas Supreme Court had criminal jurisdiction. Article 744 of the 1857 Code, provided,

"The Supreme Court may revise the judgment in a criminal action, as well upon the law as upon the facts, but when a cause is reversed for the reason that the verdict is contrary to the weight of the evidence, the same shall in all cases be remanded for a new trial."

This provision remained when the court of appeals in Texas was granted jurisdiction over criminal matters. Article 870 of the 1879 Code, provided,

"The court of appeals may reverse the judgment in a criminal action, as well upon the law as the facts; but, when a cause is reversed for the reason that the verdict is contrary to the weight of the evidence, the same shall, in all cases, be remanded for a new trial."

And when our Court was created in 1892, article 905 of the Code of Criminal Procedure was identical to article 870 of the 1879 code, except that Court of Criminal Appeals was substituted for court of appeals. Article 848 of the 1950 Code provided,

The Court of Criminal Appeals may reverse the judgment in a criminal action, as well upon the law as upon the facts. A cause reversed because the verdict is contrary to the evidence shall be remanded for new trial.

a case both upon the law and the facts. Therefore, *White v. State*, 591 S.W.2d 851 (Tex.Crim.App.1979) is expressly overruled, and any reliance on that case by our Court in *Meraz* was misplaced.

 Our power to review questions of fact was well established prior to *White v. State*, 591 S.W.2d 851, and by amending the constitution and creating a two-tiered appellate system, the Framers of our Constitution have again evinced a desire to limit factual review to the direct appellate courts. By making the direct appellate courts' determinations of questions of fact final, the Framers intention of permitting a single factual review in any case has been accorded. In our capacity as a direct appellate court in capital cases in which the defendant receives a sentence of death, we retain our ability to factually review a criminal cause. This power is inherent in our "appellate jurisdiction" and the lack of any corresponding constitutional restriction. *Republic v. Smith*, Dallam 407, 410–411 (Tex.1841); *Bishop v. State*, 43 Tex. 390, 400 (1875); *accord, Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 648 (Tex.1988); *Pool v. Ford Motor Co*, 715 S.W.2d 629, 633 (Tex.1986); *Traylor v. Goulding*, 497 S.W.2d 944, 945 (Tex.1973); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951); *Choate v. San Antonio & A.P. Ry.*, 91 Tex. 406, 44 S.W. 69 (1898); *Bailey v. Haddy*, Dallam 376 (Tex.1841). Therefore, we proceed with appellant's first point of error.

## B. FACTUAL REVIEW

 In conducting a factual review of an affirmative defense, the proper standard for review is, whether after considering all the evidence relevant to appellant's affirmative defense of insanity, "the judgment is so against the great weight and preponderance of the evidence so as to be manifestly unjust." *Meraz*, 785 S.W.2d at 155. At trial appellant had both the burden of production

This provision was adopted by the 1979 Code in article 44.25, and in 1981, it was changed to its

of evidence and the burden of persuasion for his affirmative defense of insanity. *Meraz*, 785 S.W.2d at 150. We begin with a brief narrative of the facts of the case.

Appellant killed his friend, Mike Trekell, and his friend's sixteen month-old son, Jayson, sometime after 6:00 p.m. on December 23, 1987. On December 26th appellant was apprehended at a motel in Tarrant County. Acting on information of appellant's whereabouts, the police dispatched a S.W.A.T. team and a negotiator to the motel. The negotiator, Detective Ansley, contacted appellant through the door of appellant's room. Eventually, appellant cracked the door, and the two spoke. Appellant said to the detective, "I know I am guilty and so do you." Detective Ansley, unsure if he had heard appellant correctly, asked appellant to repeat the statement. Appellant did. After further negotiations, appellant surrendered and was arrested. Subsequent to his arrest, appellant confessed:

for the past 14 months I have felt that Mike [Trekell] has been conspiring against me and trying to discredit me concerning a lawsuit I have against Frito Lay. I had been thinking about getting back at him for a while and it has been on my mind when I—and it was on my mind when I came to his house that night. While Mike was fixing the steaks I went over by him, and the next thing I knew I shot Mike with a Ruger .357 Magnum, with 158 grain silver tips. When I shot Mike he was sitting at the kitchen table. He never saw the gun and didn't know I was going to shoot him.

I don't know why, but after I shot Mike I took some cellophane from the refrigerator and went into Jayson's room. I wrapped the cellophane around Jayson's head and suffocated him. I then filled the sink up with water and placed Jayson face down into the water. I just left him there.

I then left the trailer and got into my car and drove around for a while. I threw

present form.

the cellophane out but I am not sure where. After I got to the motel room I couldn't sleep. I took a lot of medication trying to force sleep on myself. I was disturbed and kept thinking about what I had done to the baby. It bothered me a lot. I regret killing the baby but not the other. I thought the police would come in the apartment and shoot me.

There is no disagreement by the parties at trial that appellant was suffering from a delusion concerning his former employer, Frito Lay, and its worker's compensation insurance company. The nature and effects of this delusion and whether appellant knew his conduct on Christmas was wrong were contested issues in the trial.

In 1985, appellant began working for the Frito Lay Company. He assisted in the maintenance of their fleet of delivery trucks. After a year on the job appellant injured his back. Because of the incapacitating effects of the injury, he filed a worker's compensation claim with Frito Lay. This claim eventually erupted into a lawsuit between the parties.

Appellant became convinced that Frito Lay and its worker's compensation insurance company were conspiring against him to prevent any collection on his claim. Appellant believed that he had gathered enough data on the insurance company to have the company suspended from operating in Texas, and as a result, the insurance company was prepared to "take him out." The number of "conspirators" grew slowly eventually including some close friends and family members. The defensive theory of insanity was that appellant killed Trekell to protect himself from these conspirators.

As time progressed after his accident so did appellant's paranoia. Appellant informed his father, a former postal worker, that the conspirators were trying to kill him by infusing through the air conditioning vent of his apartment a poisonous "green gas." He also told his father that his apartment was "bugged," or electronically monitored. His

father testified that the alleged recording devise was actually a connecting block for a modular telephone. Despite all the evidence of paranoia, appellant's father believed appellant knew the difference between right and wrong.

Both of appellant's civil worker's compensation attorneys testified at trial. His first attorney withdrew because of appellant's financial demands and because of appellant's desired increased role in the investigation of the case. Appellant had informed this attorney that Frito–Lay had people following him.

Appellant's second attorney had also been informed by appellant of his beliefs that certain Frito–Lay people were following him, trying to poison him through the emission of a poisonous green gas, and recording his conversations. During the attorney's representation of appellant, appellant rammed his car into the automobile of one of the insurance investigators who had been following him. Criminal mischief charges were filed against appellant on this basis, and he plead guilty. Appellant's worker's compensation attorney filed a motion for new trial to set aside that plea on the basis that appellant was not competent when he entered the plea of guilty. In only a few instances in his seventeen years as an attorney, had he thought a client was insane or incompetent and filed the necessary pleadings.

There was considerable psychiatric evidence introduced at trial. Five different psychiatric professionals testified during the trial concerning appellant's past and present mental condition. Appellant's psychiatric treatment began in 1986 when he first was referred to a psychiatrist, Dr. Eudaly, Jr., by his medical doctor, Dr. Saifee. In September of 1986, appellant was admitted for severe depression to the psychiatric floor of Saint Joseph Hospital. This was the first of appellant's three separate hospitalizations for psychiatric care prior to the commission of the crime at issue today.

At St. Joseph appellant was diagnosed as

having a schizoaffective disorder.[6] This diagnosis was ruled out after appellant's second hospitalization. Appellant was released in October, and Dr. Eudaly continued to meet with appellant every three to four weeks. Appellant also began seeing Dr. Koechel once a week.

Appellant was admitted in July of 1987 to Oak Bend Hospital. He remained there until mid-October of 1987. There was some evidence at trial that his departure was premature and may have been due to appellant's lack of insurance and not his mental improvement.[7]

In December of 1987, appellant was readmitted to Saint Joseph where he undertook a series of electro-shock therapy. This type of therapy, Dr. Eudaly testified, was employed when medical treatment has failed. Some time after appellant's third and final electro-shock treatment, appellant left the hospital and returned to his home. He phoned the hospital to inform the nursing staff that he no longer needed treatment. When so informed, Dr. Eudaly indicated that he believed appellant's exit was premature, however, he decided to wait a day to see if appellant would change his mind. The next day Dr. Eudaly and appellant spoke over the phone concerning appellant's status. After their discussion Dr. Eudaly dismissed appellant from the hospital's care.

Later that month appellant killed his friend Trekell and Trekell's infant son. Dr. Eudaly testified that appellant did not "suffer from a severe mental disease or defect such that he could not tell or did not know his conduct was wrong."

Appellant's three other expert witnesses, doctors Griffith, Grigson, and Finn, all testi-fied to the contrary. Each said that appellant was suffering from a severe disease or defect such that he could not or did not know his conduct was wrong. The State also had an expert, Dr. Coons, who testified that appellant was legally sane. Much of the "battle of the experts" involved disputes concerning the prescription of certain drugs and whether, as Dr. Coons testified, appellant's hallucinations were in fact the result of amphetamine abuse. Appellant had a past history of amphetamine abuse, although the extent of this abuse was uncertain.

While several of appellant's experts testified that appellant could not or did not know his conduct was wrong, several did testify that appellant knew his conduct was illegal. This is also supported by appellant's first statements to Detective Ansley at his apprehension. Appellant stated, "I know I am guilty and so do you." This evinces an understanding by appellant that he knew his conduct was illegal, whether or not he believed it to be or would have characterized it as "wrong."

## C. LAW OF INSANITY

 Section 8.01 of the Penal Code provides for the affirmative defense of insanity:

(a) It is an affirmative defense to prosecution that, at the time of the conduct changed, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong.

The issue of insanity is not strictly medical; it also invokes both legal and ethical considerations. *See Graham v. State,* 566 S.W.2d 941, 948–949 (Tex.Crim.App.1978) (en banc);

6. Dr. Eudaly testified that "schizoaffective disorder" is a "term that is used to designate a condition which has some mixed features. Primarily it's in the category of emotional disturbance such as depression, but it's also used to indicate that there probably is some element of thinking disturbance associated with their present condition."

7. There was considerable testimony concerning a drug, Prolixin, prescribed at Oak Bend. Several of the mental health experts testified, including Dr. Eudaly, that Prolixin was generally prescribed to treat psychotic symptoms and specifically schizophrenia. This was the reason the drug was prescribed upon appellant's first hospitalization. However, in this instance Dr. Eudaly prescribed Prolixin for use as a booster for the anti-depressant drugs which had also been prescribed. When appellant was arrested at the hotel he was in possession of nine prescription medications including Prolixin.

*Taylor v. State,* 856 S.W.2d 459, 468–469 (Tex.App.—Houston [1st Dist] 1993, pet. granted). In deciding the ultimate issue of sanity, only the jury can join the non-medical components that must be considered in deciding the ultimate issue. *Graham,* 566 S.W.2d at 949. Otherwise the issue of sanity would be decided in the hospitals and not the courtrooms. *Ibid.* "Ultimately the issue of insanity at the time of the offense excusing criminal responsibility lies in the province of the jury, not only as to the credibility of the witnesses and the weight of the evidence, but also as to the limits of the defense itself." *Id.,* at 952. However, this does not preclude a factual review of the jury's determination. As this Court stated in *Graham,*

> The limits of many defenses are left to the jury. Such limits are usually expressed in terms that leave to the jury the application of norms that are not readily susceptible to reduction to a concise factual formula. The jury in this sense participates in determining the law as well as the facts. Many defenses exhibit this characteristic through the incorporation of a standard of "reasonable belief." [cites omitted.] According to the standard and the scope of the issue, the degree of discretion accorded the jury in resolving the issue on undisputed facts will vary. Before such a decision may be overturned on appeal, the fact issue must be undisputed or resolved to one end of the spectrum, *and* that fact determination must be found to lie outside the realm of discretion accorded the jury under the applicable standard, be it "reasonable belief," "reasonable firmness," "likely to cause," or some other.

566 S.W.2d at 952, n. 3.

■ In the instant cause both the State and the defense produced medical experts who testified concerning appellant's sanity at the time he committed the crime. Appellant's father testified that he believed appel-lant knew the difference between right and wrong when he committed the multiple murders. This evidence of sanity is also buttressed by appellant's own statements upon his arrest at the motel. Appellant informed the officer that he knew he was guilty. There is no question that appellant's evidence of his delusions was extensive. However, this does not resolve the question of appellant's "legal" sanity. The jury's determination of the fact issue of sanity does not appear to be resolved or undisputed to one end of the spectrum, nor does that determination appear to be beyond the realm of discretion afforded to the jury. *See Graham,* 566 S.W.2d at 852.

■ Several expert witnesses testified appellant knew his conduct was illegal, however, these experts contended that appellant did not know the act was "morally" wrong. In other words, appellant believed that regardless of society's views about this illegal act and his understanding it was illegal, under his "moral" code it was permissible. This focus upon appellant's morality is misplaced. The question of insanity should focus on whether a defendant understood the nature and quality of his action and whether it was an act he ought to do. *Zimmerman v. State,* 85 Tex.Cr.R. 630, 215 S.W. 101, 105 (1919) (on rehearing). By accepting and acknowledging his action was "illegal" by societal standards, he understood that others believed his conduct was "wrong." [8]

Therefore, upon our review we do not believe the evidence preponderates to such an extent in favor of appellant that the jury's implicit finding was so against the great weight and preponderance of the evidence that it was manifestly unjust. Appellant's first point of error is overruled.

## II. VOIR DIRE

In appellant's fourth through seventh points of error, he complains the trial court

---

8. Appellant's argument and his expert's testimony present a stronger defense under the old insanity defense. Prior to 1983 it was a defense to a crime if a defendant knew his conduct was "wrong," but nevertheless he was incapable of conforming his conduct to the requirements of the law. Tex.Penal Code Ann. § 8.01 (1974). However, this defense was eliminated in August of 1983.

erred in refusing to permit him to see the entire jury panel prior to deciding whether to demand a jury shuffle. *See* Tex.Code Crim. Proc.Ann. art. 35.11. After the venire was impaneled, appellant filed a motion to have the absent individuals included in the jury list and seated prior to his determination of whether he would exercise his right to a jury shuffle. This motion was denied by the court.

■ Because the absent individuals were not eligible to serve upon the jury, appellant's request was untimely. Article 35.01 of the Texas Code of Criminal Procedure provides for the summoning of potential jurors. The article provides specifically for individuals who are absent:

> A person who is summoned but not present, may upon an appearance, *before the jury is qualified*, be tried as to his qualifications and impaneled as a juror unless challenged, but no cause shall be unreasonably delayed on account of his absence.

Tex.Code Crim.Proc.Ann. art. 35.01 (emphasis added). Appellant's request occurred *after* the court tried the qualifications of those present. Therefore, the absent individuals were not entitled to serve as jurors. Because those absent individuals were not eligible to serve, the court did not abuse its discretion in overruling appellant's request to have those individuals included in the jury list for purposes of article 35.11 of the code. Appellant's fourth through seventh points of error are overruled.

In his eighth point of error, appellant complains the trial court erred by requiring his counsel to exercise challenges for cause in a manner contrary to Article 35.13 of the Texas Code of Criminal Procedure. Article 35.13 provides,

> A juror in a capital case in which the state has made it known it will seek the death penalty, held to be qualified, shall be passed for acceptance or challenge first to the state and then to the defendant. Challenges to jurors are either peremptory or for cause.

Upon completion of voir dire of the eleventh veniremember by both appellant and the State, appellant passed the juror to the State. Outside the presence of the juror, the trial court requested whether the State accepted the potential juror. The State accepted. Appellant's trial counsel then challenged the veniremember for cause. At this point a discussion ensued between the trial court, the prosecution, and the defense attorneys. Veniremember number eleven was eventually accepted by both appellant and the State.

Prior to the examination of veniremember twelve and after considerable discussion between the attorneys and the judge, the trial court ruled that the challenges in future voir dire would proceed as follows: State's challenge for cause, appellant's challenge for cause, State's peremptory challenge, and appellant's peremptory challenge. Appellant's trial counsel objected, specifically commenting this ruling violated the selection procedure set forth in Article 35.13, *supra.*

Appellant's eighth point of error requires that we now interpret for the first time the meaning of the "Passing Juror for Challenge" provision of the Texas Code of Criminal Procedure. Art. 35.13, *supra.* "When attempting to discern [the] collective legislative intent or purpose [of a statute], we necessarily focus our attention on the literal text of the statute in question and attempt to discern the fair, objective meaning of that text at the time of its enactment." *Boykin v. State,* 818 S.W.2d 782, 785 (Tex.Crim.App. 1991). One exception has been noted to this general rule, that is, that where such a reading would lead to an absurd result that could not *possibly* have been intended, we will not favor such a construction. *Ibid.; Faulk v. State,* 608 S.W.2d 625, 630 (Tex.Crim.App. 1980).

Article 35.13 states succinctly that the veniremember shall "be passed for acceptance or challenge first to the state and then to the defendant. Challenges to jurors are either peremptory or for cause." It seems apparent, the legislature intended that defendant's challenges for cause could be made

after the State has made its decision to accept a veniremember. In this instance the statutory language evokes no other logical interpretation.

The manner of selecting a jury in a capital case is regulated by Article 35.20 of the Texas Code of Criminal Procedure. In part, the article provides that

> In selecting the jury from the persons summoned, the names of such persons shall be called in the order in which they appear upon the list furnished the defendant. Each juror shall be tried and passed upon separately.

When read in conjunction with Article 35.13, the clear import of the statute is to provide that in capital cases, the jurors shall be called individually. Upon completion of voir dire by both parties of that potential juror, the State must choose to accept the veniremember or challenge him for cause or peremptorily, and then the defendant or his counsel may exercise its peremptory or causal challenge.[9]

This interpretation of Article 35.13 is neither novel nor new. Indeed, this explanation was previously recognized by the Honorable Judge John Onion in 1965, shortly after the statute was enacted. In his Special Commentary to Article 35.13, of the Texas Code of Criminal Procedure, Presiding Judge Onion wrote that

> Article 35.20 would seem to support the provisions of Article 35.13 which would permit the defense to demand that the State accept or challenge for cause each juror before the defense exercises its challenges for cause or peremptorily.

(Vernon 1989). Therefore, the trial court erred in overruling appellant's objection to the order of voir dire.

Having thus found the court fell into error, we must next consider whether a harm analysis should be considered under Rule 81(b)(2) of the Texas Rules of Appellate Procedure.

The application or non-application of the harmless error rule has been of particular concern to this Court of late. *See Marin v. State*, 851 S.W.2d 275 (Tex.Crim.App.1993) (violation of legislative prophylactic procedural rule concerning number of days for preparation for trial was too speculative to be considered by harmless error rule); *Meek v. State*, 851 S.W.2d 868 (Tex.Crim.App.1993) (the defendant's written waiver of the right to trial by jury is not subject to a harmless error rule); *Warmoski v. State*, 853 S.W.2d 575 (Tex.Crim.App.1993) (the right to sever indictments under Section 3.04(a) of the Penal Code is not subject to the harmless error rule); *Sodipo v. State*, 815 S.W.2d 551 (Tex. Crim.App.1990) (violations of Article 28.10 are not subject to harm analysis because appellate court cannot determine from record whether harm existed); *Nunfio v. State*, 808 S.W.2d 482 (Tex.Crim.App.1991) (denial of proper *voir dire* question that prevents intelligent exercise of peremptory challenges not subject to harm analysis under 81(b)(2)).

In *Marin*, this Court stated,

> The harmless error rule in general, and Rule 81(b)(2) in particular, was not designed for the hypothetical retrial of defective criminal litigation in the appellate courts. Speculation about the possible effect of ignoring prophylactic procedural rules, let alone disregarding essential features of the adversary process, is always a perverse and inappropriate application of the harmless error doctrine. Indeed, it is precisely because many of these rules define, in the aggregate, what is a tolerably fair trial under our system of criminal justice that their disregard must necessarily undermine the confidence in the outcome of trial. Otherwise, we may eventually come to believe that denying an accused even the assistance of counsel is harmless whenever the jury would almost certainly have convicted him in any event.
>
> For this reason, the harmless error doctrine is broadly consistent with a rule-

---

**9.** Nothing in this opinion contemplates preventing either party from making a challenge for cause at an earlier moment, thus eliminating the need for continuing needless and time consuming voir dire.

governed system of adjudication only when it does not threaten to undermine the very precepts which distinctly specify the fair operation of that system. These precepts include not only fundamental rules of due process and due course of law, but prophylactic rules of procedure designed, in most cases by the Legislature, to impose a uniform requirement where the fairness of a flexible rule is too uncertain.

851 S.W.2d at 281.

In *Marin*, we considerably limited the application of the harmless error rule by appellate courts in reviewing procedural errors of trial courts. The rationale for such a limitation was to prevent speculation as to harm where the legislature has created prophylactic rules of procedure. *Id.* *Marin* itself concerned the allotted time given for preparation of appointed counsel. Because the legislature intended a specific manner of notice and because the effect of not providing the specified notice was speculative at best, the appellate court was not to apply the harmless error rule to the trial court's failure to provide the statutory notice.

However, in the instant case there is no speculation necessary to determine whether harm existed. The proper order of challenges should have been State's challenge for cause, State's peremptory challenge, Defendant's challenge for cause, and Defendant's peremptory challenge. In this case the order of challenges occurred as follows: State's challenge for cause, Defendant's challenge for cause, State's peremptory challenge, and Defendant's peremptory challenge. Essentially the order of the State's peremptory challenge and the defendant's challenge for cause were reversed. We do note, however,

that the State's challenge for cause remained first and the defendant's peremptory challenged was last.[10]

The reversal of the challenges would have no effect on the selection of jurors. This is so because the State's ability to challenge venire persons for cause is broader and encompasses the defendant's ability to challenge a potential juror. A defendant may exercise a challenge for cause for the reasons enumerated in Article 35.16(c) of the Texas Code of Criminal Procedure. The State may also challenge a juror for these reasons pursuant to Article 35.16(b)(3), and it may have a duty to so challenge. *See Allridge v. State,* 850 S.W.2d 471, 486–487 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993); *White v. State,* 779 S.W.2d 809, 826 (Tex.Crim.App.1989), *cert. denied,* 495 U.S. 962, 110 S.Ct. 2575, 109 L.Ed.2d 757 (1990); *Nethery v. State,* 692 S.W.2d 686, 691 (Tex.Crim.App.1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986); *Holloway v. State,* 691 S.W.2d 608, 612 (Tex.Crim.App.1984), *vacated on other grounds* 475 U.S. 1105, 106 S.Ct. 1508, 89 L.Ed.2d 908 (1986); *Hernandez v. State,* 643 S.W.2d 397 (Tex.Crim.App.), *cert. denied,* 462 U.S. 1144, 103 S.Ct. 3128, 77 L.Ed.2d 1379 (1983); *Chambers v. State,* 568 S.W.2d 313 (Tex.Crim.App.1978), *overruled on other grounds, Grijalva v. State,* 614 S.W.2d 420, 425 (Tex.Crim.App.1981). Because the State's challenge for cause encompasses the defendant's challenge, there could be no possible harm in forcing the defendant to exercise its challenge for cause prior to the State's peremptory challenge. Accordingly, we hold the trial court erred in overruling the defendant's motion concerning the order of challenges, and that error was

10. Clearly there is an advantage to the defendant making his peremptory challenge after the State. In *Janecka v. State,* this Court noted:

It is obvious that Art. 35.13, *supra,* on its face and in practice is beneficial to a capital defendant in ways that the other relevant statutes are not beneficial to non-capital felony defendants. A capital murder defendant examines the veniremen individually and in isolation. This generally allows for more detailed evaluation of a venireman and prevents a potential

juror from being influenced by the responses of others. Capital defendants do not have to exercise a peremptory strike against a particular venireman until the State has first decided whether to do so. Thus, if the State and the defendant do not want a given venireman, and he cannot be excluded for cause, the defendant will benefit by saving one of his peremptory challenges.

739 S.W.2d 813, 834 (Tex.Crim.App.1987).

harmless. Tex.R.App.P. 81(b)(2). Appellant's eighth point of error is overruled.

In appellant's ninth and tenth points of error, he argues that the trial court's error in requiring appellant's challenge for cause to precede the State's peremptory challenge violated both the Texas Constitution, Article I, Section 10, and the Sixth Amendment of the United States Constitution, respectively. Appellant's argument is that the statute is designed to provide him with a tactical advantage and that advantage has been deprived. As has been previously mentioned, there is no tactical advantage to forcing appellant to exercise his causal challenge prior to the State's peremptory challenge. *See* Point of error eight, *supra*. Additionally, appellant furnishes this Court with no explanation or argument to support this argument. Nor does appellant present any rationale to explain how this statutory rule rises to constitutional dimensions. *See* Tex. R.App.Proc. 74(f). Therefore, appellant's ninth and tenth points of error are overruled.

In the eleventh point of error, appellant argues the trial court erred in granting the State's challenge for cause of veniremember Sparks. When the State challenged Sparks it advanced numerous grounds upon which the to base such a causal challenge. The court granted the State's challenge because the veniremember was unable to distinguish between the terms "deliberately" and "intentionally" and because the veniremember would "[reverse] the burden of proof and not give a fair consideration of the insanity defense." Much of appellant's brief objects to the State's ability to challenge Sparks on the basis of his opposition to the insanity defense. However, because the court did not abuse its discretion in granting the State's challenge based upon Sparks' inability to sufficiently distinguish between the terms "deliberately" and "intentionally," we need not further examine the court's ruling. A veniremember who cannot distinguish between a "deliberate" and "intentional" killing is subject to a challenge for cause. *Nethery v. State,* 692 S.W.2d at 691; Tex.Code Crim. Proc.Ann. art. 35.16(b)(3).

In reviewing the court's ruling, we look at Spark's entire voir dire examination to determine whether there is support for the court's ruling. *Satterwhite v. State,* 858 S.W.2d 412, 415 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 114 S.Ct. 455, 126 L.Ed.2d 387 (1993); *Moody v. State,* 827 S.W.2d 875, 884 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 113 S.Ct. 119, 121 L.Ed.2d 75 (1992). We afford a great deference to the court's decision because "[i]t is the trial judge who has the opportunity to view each venireman's demeanor, evaluate his credibility and, ultimately, who is in the better position to pass on the challenges for cause presented." *Satterwhite,* 858 S.W.2d at 415. This ruling will not be disturbed absent a showing of an abuse of discretion. *Ibid.*; *Williams v. State,* 773 S.W.2d 525, 536 (Tex.Crim.App.1988), *cert. denied,* 493 U.S. 900, 110 S.Ct. 257, 107 L.Ed.2d 207 (1989).

Appellant correctly points out that Sparks indicated that he could distinguish between the terms. However, a review of the *entire* record indicates that Sparks appeared to equivocate in his response to questioning on the subject. In fact at one point Sparks indicated that an intentional action encompassed and was broader than deliberate action. In our examination of the entire voir dire, we do not believe the trial court abused its discretion in sustaining the State's challenge. Appellant's eleventh point of error is overruled.

In his twelfth and thirteenth points of error, appellant alleges the trial court improperly overruled his challenge for cause to veniremembers Ledbetter and Blei. However, appellant has failed to preserve error. After appellant exercised his fifteenth peremptory challenge, the trial court granted his request for two additional peremptory challenges. Neither challenge was used. In order to preserve error for a trial court's denial of a defense challenge for cause, it must be demonstrated on the record that the defendant asserted a clear and specific challenge for cause clearly articulating grounds therefor, that he used a peremptory chal-

lenge on that juror, that all his peremptory challenges were exhausted, that his request for additional strikes is denied, and that an objectionable juror sat on the case. *Harris v. State,* 790 S.W.2d 568, 581 (Tex.Crim.App. 1989); *Felder v. State,* 758 S.W.2d 760, 766–767 (Tex.Crim.App.1988); *Payton v. State,* 572 S.W.2d 677, 680 (Tex.Crim.App.1978). By not exercising his two additional challenges, appellant failed to exhaust *all* his peremptory challenges and failed to preserve error to complain of the propriety of the trial court's ruling on his challenges for cause. Appellant's twelfth and thirteenth points of error are overruled.

### III. TRIAL ERROR

In the second point of error, appellant contends that the trial court erred by admitting evidence of his attempted escape from the courtroom prior to the conclusion of the guilt phase of the trial. *See* Tex.R.Crim. Evid. 404(b). Outside the presence of the jury near the conclusion of the guilt phase of the trial, appellant somehow secured a gun located behind the trial judge's bench. He proceeded into the judge's chambers, aimed the gun at the judge, and informed him that they were leaving together. The trial judge leapt across the desk and grabbed the weapon. With the help of a bailiff, who had finally arrived, and an assistant district attorney they disarmed and subdued appellant.

▇ Evidence of flight or escape is admissible as a circumstance from which an inference of guilt may be drawn. *Foster v. State,* 779 S.W.2d 845, 859 (Tex.Crim.App. 1989), *cert. denied,* 494 U.S. 1039, 110 S.Ct. 1505, 108 L.Ed.2d 639 (1990); *Cantrell v. State,* 731 S.W.2d 84, 93 (Tex.Crim.App.1987) (evidence of bond forfeiture may be admissible as tending to show flight); *Rumbaugh v. State,* 629 S.W.2d 747, 752 (Tex.Crim.App. 1982); *See* Tex.Crim.R.Evid. 401. To support the admission of evidence of escape from custody or flight it must appear that the escape or flight have some legal relevance to the offense under prosecution. *Rumbaugh,* 629 S.W.2d at 752; *Wockenfuss v. State,* 521 S.W.2d 630, 632 (Tex.Crim.App. 1975) (evidence of flight, in the context of bail-jumping, may be construed as evidence of guilt); *Hodge v. State,* 506 S.W.2d 870, 873 (Tex.Crim.App.1974) (on rehearing). To have such evidence excluded under relevancy challenges, the burden shifts to the defendant to show affirmatively the escape and flight directly connected to some other transaction and further that it was not connected with the offense at trial. *Wockenfuss,* 521 S.W.2d at 632; *Hodge,* 506 S.W.2d at 873.

▇ While appellant concedes that flight is generally admissible, he argues that because his defense was insanity the issue of guilt was not contested. However, appellant's affirmative defense does not relieve the State from its burden of proving all the elements beyond a reasonable doubt. Appellant's attempted escape clearly had relevance to appellant's guilt of the crime charged as it was committed during the guilt phase of the trial. Tex.R.Crim.Evid. 404(b). The second point of error is overruled.

▇ In his third point of error, appellant argues that even if this evidence were somehow deemed relevant, the prejudicial effect of the evidence substantially outweighed any probative value. *See* Tex.R.Crim.Evid. 403. When an appellate court reviews a trial court's decision on this basis it should not reverse the court if the ruling is "within a reasonable zone of disagreement." *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex. Crim.App.1990) (on rehearing).

▇ In reviewing the court's decision we look to the strength of the proponent's other evidence tending to show the defendant committed the crime charged. *Montgomery,* 810 S.W.2d at 390. This should take into account the nature of any affirmative defense by a defendant. Additionally, we look to see if the evidence presented would likely impress the jury "in some irrational but nevertheless indelible way." *Ibid.* A trial court should also look to see what "need" the proponent has for such evidence and the time it may take to prove such evidence in determin-

ing the prejudicial effect of the evidence. *Ibid.*

 In this case, appellant presented an affirmative defense of insanity and did little to contest his guilt. These factors tend to favor the exclusion of extraneous offenses that are not admitted to rebut the insanity defense.[11] However, we must also look to how compelling or probative the evidence of flight is concerning a fact of consequence. *Montgomery,* 810 S.W.2d at 391. In this instance, the evidence of flight goes to the very guilt of appellant. Evidence of flight, unlike many other extraneous offenses, shows a consciousness of guilt of the crime for which the defendant is on trial. *See Foster,* 779 S.W.2d at 859; *Cantrell,* 731 S.W.2d at 93; *Rumbaugh,* 629 S.W.2d at 752; *Wockenfuss,* 521 S.W.2d at 632; *Hodge v. State,* 506 S.W.2d at 873. Because the evidence of flight enhances the State's case, the trial court's ruling was within the "zone of reasonable disagreement." Appellant's third point of error is overruled.

In his fourteenth point of error, appellant contends the trial court abused its discretion in denying his request for the appointment of an additional psychiatrist to determine his competence to stand trial. On January 9, 1991 a jury determined appellant was competent to stand trial. On February 26, 1991, near the conclusion of voir dire, appellant moved for the appointment of an additional psychiatrist to determine whether appellant was still competent. This motion was precipitated, in part, by appellant's statements to the trial court the morning of the 26th. That morning the following exchange occurred:

APPELLANT: Judge Leonard, I am dangerous and I don't think I can control myself. I don't know what you are going to do with me.

THE COURT: What are you referring to, son? I mean, sitting in Court you are dangerous or future dangerous or what are we talking about?

APPELLANT: I am dangerous now and I will continue to be.

THE COURT: Well, I am not going to do anything with you but see that you get a fair trial. We are going to put this in the hands of the community like we do, but what do you want me to do?

[DEFENSE COUNSEL:] I think what part of the concern is, he is having difficulty sitting here through the proceedings at this point, Judge, and I told him basically the alternatives that the Court has.

THE COURT: Have you changed your medicine or something? You've been having a pretty good time or at least you've been in—

APPELLANT: I discontinued it myself.

THE COURT: You discontinued it yourself?

APPELLANT: I discontinued it myself.

THE COURT: Well, Lord knows we have our problems with doctors, but I think you better continue it and I will tell you why. Maybe you've forgotten. I've got to go to an awful lot of trouble for you to be absent, and when we are trying you on the question of whether or not there is future dangerousness, people saying you are mean and kill people and you are not here, that leaves the question in their mind as to why you are not here. So if you can sit there and look fairly normal, which you have so far, it's to your benefit. Because if I have to start putting shackles on you and all of that stuff it's going to look bad; the District Attorney's Office is trying to prove you are dangerous and you are sitting there with shackles on and a gag on. It's your life and it's dangerous to discontinue it if the doctor has recommended medicine. Unless your attorney tells you to the contrary, I think—I would take it I don't have to bear the troubles you do, and I am having hell sitting here so you certainly need all of the help you can get.

---

11. The State also contended at trial and on appeal that the evidence of his escape was also relevant to appellant's insanity defense. However, we are uncertain as to how appellant's present consciousness of guilt is relevant to whether he knew his act was wrong when he committed the murders.

What do you think, why did you discontinue your medicine?

APPELLANT: To see if I could summon him.

THE COURT: Summon him? Well—

APPELLANT: Judge Leonard, I know the difference between right and wrong. That's why I am standing before you right now, because I don't want to hurt anyone else.

THE COURT: Well. What do you lawyers want to do?

[DEFENSE COUNSEL:] I would like to take just a minute and talk to [appellant] and see if he thinks he can pull himself together enough to sit here through the rest of voir dire. I explained his options to him, none of which are to your benefit. I am not sure if he feels he can be with us and that's why I wanted to talk to him.

THE COURT: I won't make you take your medicine, Mr. Bigby, but I can make you be still. Go back and talk to your lawyers, and if you want to call over for your medicine you can do it.

The following day appellant moved for the appointment of a disinterested expert to examine appellant to determine his competency to stand trial. Article 46.02, Section 3(a), of the Code of Criminal Procedure provides:

At any time the issue of the defendant's incompetency to stand trial is raised, the court may, on its own motion or motion by the defendant, his counsel, or the prosecuting attorney, appoint disinterested experts experienced and qualified in mental health or mental retardation to examine the defendant with regard to his competency to stand trial and to testify at any trial or hearing on this issue.

The trial court denied appellant's request.

■■■■ The decision to appoint a disinterested expert to examine a defendant with regard to his or her competency to stand trial is left to the sound discretion of the trial court. *Leyva v. State*, 552 S.W.2d 158, 161 (Tex.Crim.App.1977). That decision is reversible only where the trial court abused its discretion. *Id.* Such a determination should be made from a review of the totality of the facts, including, as in this instance, any other prior competency examination or jury determination. In this instance we do not believe the trial court abused its discretion in denying appellant's motion under Article 46.02, Section 3(a).

■■■■ During appellant's conversation with the trial judge on the morning of February 26th, appellant indicated that he had ceased taking his medication and that he no longer had a desire to remain in the courtroom because he feared he was "dangerous." In appellant's previous competency hearing, his expert testified that appellant was no longer taking his medication. Dr. Finn, his expert psychologist, testified that appellant was placing his prescription medication under his tongue and feigning swallowing the pills. Because appellant's failure to take the prescribed medication was not new evidence, the trial court did not abuse its discretion in refusing appellant's motion for re-examination.

■■■■ Additionally, appellant's other statements and those of his attorneys in their affidavit do not indicate that appellant's condition had changed, thus necessitating an additional expert. Appellant's statements concerning his desire not to be present and his belief that he was a danger are not evidence that appellant was incompetent. Appellant's conversations with the trial judge indicate a complete understanding of the proceedings. Appellant's statements, while admittedly strange, and his counsels' affidavit do not indicate that appellant did not have a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" or "a rational as well as factual understanding of the proceedings against him." Tex.Code Crim.Proc.Ann. art. 46.02, § 1(a). Accordingly, the trial court did not abuse its discretion in deny appellant's motion. Appellant's fourteenth point of error is overruled.

In the fifteenth point of error, appellant argues that the trial court erred by failing to

instruct the jury that the State's opening statement was not evidence. At the conclusion of the State's opening statement appellant requested the court instruct the jury that the opening statement was not evidence. The trial court denied his request. On appeal, appellant contends the State mislead the jury by indicating that certain arguments were actually facts. However, even if it is proper in some instances to instruct the jury in this manner, it was not necessary in this case.

■ We do not believe the jury could have been mislead into believing that those statements were actually evidence. The State began its opening statement, "Ladies and gentlemen, the State will present you evidence in this case that will tell a grisly tale of multiple murder." The opening continued discussing the three "chapters" to the story and its "epilogue" being the trial. The State informed the jury of what they would "hear" told and who would tell the story. While appellant is able to locate two statements in the record in which the State did not state "the evidence will show," we do not believe from a review of the entire record that the jury was misled or that the trial court abused its discretion in overruling appellant's request for the instruction. Appellant's fifteenth point of error is overruled.

In the sixteenth point of error, appellant contends the trial court improperly limited

his cross-examination of Grace Kehler—Trekell's surviving spouse and the infant's mother. Specifically he contends "the trial court erred in preventing defense counsel from questioning [Kehler] about the specific allegations she made in her lawsuit against various doctors who treated appellant and numerous hospitals where appellant was treated prior to the killings." Kehler had filed a civil negligence suit in which it was alleged that the hospital, its employees, and the doctors were negligent in discharging appellant. At trial appellant argued the questions concerning the civil suit were relevant for two purposes—to show a motive or bias and to show a prior inconsistent statement. On appeal, his contention is couched in terms of the trial court's error in limiting his cross examination of Kehler.

■ Appellant's trial objections were based upon Rule 612 of the Criminal Rules of Evidence.[12] Section (a) provides for the examination of a witness concerning a prior inconsistent statement. However, the statement must be made by her. In this instance the pleadings were not signed by Kehler, but rather by her attorney, and therefore, they are not her prior inconsistent statements within the meaning of the rule.[13]

■ Appellant's second ground for the admissibility or examination was that the

---

12. Rule 612 of the Rule of Criminal Evidence provides:

(a) **Examining witness concerning prior inconsistent statement.** In examining a witness concerning a prior inconsistent statement made by him, whether oral or written, and before further cross-examination concerning, or extrinsic evidence of, such statement may be allowed, the witness must be told the contents of such statement and the time and place and the person to whom it was made, and must be afforded an opportunity to explain or deny such statement. If written, the writing need not be shown to him at that time, but on request the same shall be shown to opposing counsel. If the witness unequivocally admits having made such statement, extrinsic evidence of same shall not be admitted. This provision does not apply to admissions of party-opponent as defined in Rule 801(e)(2).

(b) **Examining witness concerning bias or interest.** In impeaching a witness by proof of circumstances or statements showing bias or

interest, on the part of such witness, and before further cross-examination concerning, or extrinsic evidence of, such bias or interest may be allowed, the circumstances supporting such claim or the details of such statement, including the contents and where, when and to whom made, must be made known to the witness, and the witness must be given an opportunity to explain or to deny such circumstances or statement. If written, the writing need not be shown to him at that time, but on request the same shall be shown to opposing counsel. If the witness unequivocally admits such bias or interest, extrinsic evidence shall not be admitted. A party shall be permitted to present evidence rebutting any evidence impeaching one of said party's witnesses on grounds of bias or interest.

13. Additionally, the trial court held that there was no inconsistent statement made by Ms. Kehler. During her examination, Ms. Kehler testified as follows:

documents showed a bias or motive for her testifying. *See* Tex.Crim.R.Evid. 612(b), *supra*. The trial court permitted appellant to "prove up by question before the jury that she has, in fact, filed a suit asking for damages on the basis that he was mentally ill. And that would, of course show any pecuniary interest and any bias that there might be other than what would somewhat be available in any event." In his brief, appellant complains that he was permitted to show that in three separate pleadings, Kehler "had, at extended length, indicated with great specificity negligent acts she believed had been committed [by] mental health care providers in the treatment of appellant; improper treatment she alleged to be the proximate cause of the victim's death." However, as indicated previously the three separate pleadings were not signed by her and cannot be attributed to her. Appellant's bill of proof was limited only to admitting the pleadings into the record. The record does not indicate whether *she* knew or believed the specific negligent acts alleged or whether her attorney believed he could prove them. We do recognize, nevertheless, that the documents do show a motive or bias for her testimony.[14] The trial court properly permitted appellant to inquire into the basis of the suit and the pecuniary interest in that suit. We do not believe, though, that the trial court abused its discretion in overruling appellant's objection or limiting his cross examination of Kehler in not permitting appellant to delve into the intricate details of Kehler's civil suit. Appellant's sixteenth point of error is overruled.

In the seventeenth point of error, appellant complains the trial court erred in not

Q: Well, you believe that [appellant] is mentally ill, don't you?
A: I believe a lot of things, and that's not one of them.
Q: You don't believe that?
A: No.
Q: You don't believe he suffered from any kind of mental illness at all?
A: Well, he's sick.

Pursuant to a motion in limine, the jury was excused a discussion concerning Ms. Kehler's civil negligence suit against the hospitals and doctors was discussed. Appellant sought to introduce the original and two subsequent pleadings in the civil case. The purpose of the admission was to show the witnesses bias or motive for testifying, (her financial interest in the civil case), and secondly, for impeachment purposes, "because she submit[ted] a position in the petition that is inconsistent with the position that she is [took] on the witness stand." The court ruled that there was no inconsistent statement made by the witness. The court permitted appellant to "prove up by question before the jury that she has, in fact, filed a suit asking for damage on the basis that he was mentally ill. And that would, of course, show pecuniary interest and any bias that there might be other than what would somewhat be available in any event." Appellant requested that he further be able to "go into the basis for the claim of negligence that she has made against each of the doctors and the hospitals." The court ruled that appellant was not permitted to go into the body of the suit, and appellant objected.

In the presence of the jury, Ms. Kehler testified:

Q: Mrs. Kehler, you are the plaintiff in a civil suit that is currently pending in a district court here in Tarrant County against Oakbend Hospital, Saint Joseph Hospital, Dr. John Koechel, and Dr. Eudaly; is that correct?
A: Yes, it is.
Q: And you have sued in that case as a plaintiff both individually and on behalf of the estates of Mike Trekell and Jayson Kehler, your son; is that correct?
A: Yes.
Q: The nature of the suit is, essentially, what we call a wrongful death action; is that right?
A: That sounds right.
Q: And, basically, the claim in the suit is that the hospital, Saint Joseph Hospital Oakbend Hospital, Dr. Harold Eudaly, and Dr. Joseph Koechel, were all negligent in their failure to perceive and treat the mental illness of [appellant,] is that right?
A: Yes.
Q: And further, your claim in that lawsuit is that they were negligent in not knowing that, based on the extent of his illness, he was dangerous and could create a possible danger to your husband and your son; is that right?
A: They were supposed to be professionals, aren't they?
Q: That's true. And that's the claim you've made in the civil suit against them; is that right?
A: Yeah, yes.

14. If this civil suit shows anything, it would indicate that Kehler's bias or motive would be to testify that he is in fact mentally ill. While a jury's finding in appellant's criminal case that he was criminally insane would not be dispositive of her civil suit, it would greatly enhance her position in that suit.

admitting Exhibit 48 into evidence. Exhibit 48 was a motion for new trial filed by Mr. Obeidin, appellant's worker's compensation attorney, in appellant's criminal mischief case. Appellant plead guilty to criminal mischief for allegedly ramming a Frito–Lay investigator's automobile. Obeidin filed the motion for new trial on the grounds that appellant was not competent to give a plea and that he did not fully understand the terms and conditions of what he was doing in pleading guilty. The State objected to the admission of this motion on hearsay grounds and relevancy grounds. Because the written statement was inadmissible hearsay, we need not address appellant's argument that the document was relevant. Tex.R.Crim.Evid. 402.

■■■ " 'Hearsay' is a statement, other than one made by the declarant while testified a the trial or hearing, offered evidence to prove the truth of the matter asserted." Tex.R.Crim.Evid. 801(d). A statement includes written verbal expression. Tex. R.Crim.Evid. 801(a)(1). The motion for new trial was offered by appellant to prove appellant's worker's compensation attorney believed appellant was not competent when he plead to the criminal mischief charge in November of 1987. Additionally as is indicated in the eighteenth point of error, *post*, the underlying assumption in the motion for new trial, that Obeidin believed appellant was insane was not based upon personal knowledge, rather it was based on the opinion of others. The trial court correctly sustained the State's objection to its admission.[15] Appellant's seventeenth point of error is overruled.

In the eighteenth point of error, appellant contends the trial court improperly sustained the State's objection to testimony that Obeidin believed appellant was insane at the time he committed criminal mischief. Again based upon hearsay, the State objected to Obeidin testifying to appellant's state of mind. During voir dire of the witness, the following exchange occurred between the State and Obeidin:

Q: Do you have any personal knowledge of this criminal offense? We are talking about the criminal mischief case involving ramming the investigator's car.

A: Gary, what I know about it was from the reading of the offense report, and then the majority of my opinion as to his mental state at the time came from the doctors' records that I had proven up in the worker's compensation case.

Q: Any opinion you have about that is based on hearsay from doctors and reports and from some offense report that you may have and that we can't cross examine here; is that right?

A: At the time of the offense?

Q: Any opinion you have about his condition at the time of the offense.

A: That is correct.

The State objected to any answer to the previous question regarding appellant's mental condition at the time of the misdemeanor offense. The court sustained the objection, admonishing the witness and appellant's attorney to, "Limit your questions and answers to personal knowledge of the witness, please."

■■■ We agree with appellant that a lay witness may testify as to his opinion that an individual is legally insane. *Fuller v. State*, 423 S.W.2d 924 (Tex.Crim.App.1968); *see Pacheco v. State*, 757 S.W.2d 729, 733 (Tex. Crim.App.1988) ("Properly admitted opinion testimony of lay witnesses is sufficient to support finding of insanity.") That opinion, though, must be based upon the personal observations or experiences of the witness.

15. Appellant further contends that the State "opened the door" to the motion during its cross-examination of Obeidin. However, a review of the questioning indicates that the State did not ask Obeidin about the motion, but rather about any damage to the worker's compensation claim that may have been caused by appellant pleading guilty to the criminal mischief charge. A discussion about the criminal charge and plea does not "open the door" to the written statements contained within the motion for new trial.

 Rule 701 of the Texas Rules of Evidence governs opinion testimony of lay witnesses. The rule provides that,

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

By requiring the testimony to be based on the "perception of the witness," the rule presumes the underlying facts were observed or experienced by the witness. This portion of the rule incorporates the personal knowledge requirement of Criminal Rule 602. *See* Goode, Wellborn and Sharlot, 2 *Texas Practice* § 701.2, at 4 (1993). The rule provides:

A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself. This rule is subject to the provisions of Rule 703, relating to opinion testimony by expert witnesses.

In this case, it was Obeidin's opinion that appellant was not competent to enter a plea to the misdemeanor offense. His opinion, however, was not based upon any observations by him, rather it was based on the opinion of others. Such evidence is not admissible as lay opinion testimony. Therefore, the trial court did not abuse its discretion in requiring Obeidin to limit his testimony to his "personal knowledge." Appellant's eighteenth point of error is overruled.

## IV. JURY CHARGE ERROR

In the nineteenth, twentieth, and twenty-first points of error, appellant contends the trial court erred in failing to inform the jury of the consequences of finding appellant not guilty by reason of insanity. This is a legislative prohibition. Tex.Code Crim.Proc.Ann. art. 46.03 § 1(e). Appellant argues this failure deprived appellant of his constitutional right to due process under both the Texas and U.S. Constitutions. These arguments were previously rejected in *Robison v. State*, 888 S.W.2d 473, 476–77 (Tex.Crim.App.1994). Appellant's points are overruled.

In appellant's twenty-second point of error, he complains the trial court erred in overruling his objection to a portion of the State's jury argument during the guilt phase of the trial. The prosecutor argued the following:

And what did Dr. Harold Eudaly tell you who saw him in December, who knew [appellant] for a long period of time, what did he tell you? His opinion was that [appellant] was not insane in the month of December in 1987.

Appellant objected, contending that the doctor's opinion was limited to the time appellant was discharged. During his examination, Dr. Eudaly testified that "At the time I last talked to him or examined him in December of 1986 (sic), in my opinion he had the capacity to distinguish right from wrong." Eleven days passed between the doctor's release and the crime charged.

 To be proper, jury argument must generally be a summation of the evidence, reasonable deductions from the evidence, answers to argument of opposing counsel, and pleas for law enforcement. *Moody v. State*, 827 S.W.2d 875, 894 (Tex.Crim.App.), *cert. denied*, —— U.S. ——, 113 S.Ct. 119, 121 L.Ed.2d 75 (1992). The prosecutor's argument was not specific nor incorrect. The prosecutor did not argue that the doctor testified that appellant was not insane *during* the whole month of December, only that he was not insane *in* the month of December. Technically, this was a correct summation of the doctor's testimony. Appellant's twenty-second point is overruled.

In the twenty-third point of error, appellant complains the court's charge during punishment improperly defined "deliberately." Appellant acknowledges that no such instruc-

tion was necessary, however, he argues that where such a definition is given that definition should be correct. The Court instructed the jury that,

> "Deliberately" as used herein is a term of common usage, but it is not the linguistic equivalent of intentional as used in the guilt/innocence phase of the trial. Deliberately is more than intent but it is less than premeditation. Rather, deliberate is a conscious decision involving a thought process which embraces more than a mere will to engage in conduct and activates the intentional act. To find deliberateness there must be a moment of deliberation and a determination on the part of the defendant to kill.

Appellant argues that the definition given does not inform the jury what the term means, rather the definition only tells the jury what deliberately does not mean. He argues that without that specific definition the jury was left to interpret the definition themselves. Appellant requested the following definition of "deliberately" be included in the jury charge:

> ... "deliberately" means a manner of doing an act characterized by or resulting from careful and thorough consideration; characterized by awareness of the consequences; willful, slow, unhurried, planned and steady as though allowing time for decision.

■ We agree with the State that appellant was not entitled to a definition of "deliberately," and that in this case the definition given was sufficient to apprise the jury that the terms "intentional" and "deliberate" are distinct and different. *See Fearance v. State,* 620 S.W.2d 577, 584 (Tex.Crim.App.1980), *cert. denied,* 454 U.S. 899, 102 S.Ct. 400, 70 L.Ed.2d 215 (1981). His twenty-third point of error is overruled.

In the twenty-fourth point of error, appellant argues that the trial court erred in overruling his requested definition of "probability" in the court's charge during punishment.

Without any argument, appellant asks this Court to reassess our longstanding *stare decisis* which has not required such a definition. We are not so inclined. *See Lewis v. State,* 815 S.W.2d 560, 563 (Tex.Crim.App. 1991), *cert. denied,* 503 U.S. 920, 112 S.Ct. 1296, 117 L.Ed.2d 519 (1992), and cases cited therein. The twenty-fourth point of error is overruled.

In his twenty-fifth and twenty-sixth points of error, appellant complains the trial court erred in overruling his request for a separate special issue concerning mitigation and that the "nullification" instruction did not satisfy the commands of *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), respectively.[16] Appellant does not complain that this specific instruction was erroneous, rather he complains only that generally a nullification instruction was inappropriate. We addressed and rejected appellant's argument in *Robertson v. State,* 871 S.W.2d 701, 710–711 (Tex.Crim.App.1993); *see also Wheatfall v. State,* 882 S.W.2d 829, 839–40 (Tex.Crim.App.1994); *Fuller v. State,* 829 S.W.2d 191, 209 (Tex.Crim.App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2418, 124 L.Ed.2d 640 (1993). Appellant's final two points of error are overruled.

The judgment of the trial court is affirmed.

CAMPBELL, J., not participating.

WHITE, Judge, concurring.

In resolving appellant's eighth point of error, the majority holds the trial court erred in the order in which it conducted voir dire. In the instant cause, the trial court decided both sides would make a decision on whether to challenge a veniremember for cause (with the State deciding first), before either side would decide whether to exercise one of its peremptory challenges (with the State again deciding first). The majority finds this decision did not comport with TEX.CODE CRIM.PROC.ANN. Art. 35.13. The majority interprets Art. 35.13 to mean in a capital case the State must choose to accept a

---

**16.** *See generally* Tex.Code Crim.Proc.Ann. art. 37.0711 § 3(e) (Effective August 30, 1993).

veniremember or challenge a veniremember for cause or with one of its peremptory challenges before a defendant or his counsel must decide whether they will challenge the veniremember for cause *or* with one of their peremptory challenges. As a result, the majority holds the trial court's decision was in error.

However, the majority holds that the trial court's "error" was harmless and overrules appellant's eighth point of error. I concur in the decision to overrule the eighth point of error. But I do not agree with the majority's interpretation of Art. 35.13, nor do I believe that the trial court erred in establishing the voir dire procedure which it chose to follow in the instant case.

In supporting its decision, the majority is only able to call upon former Presiding Judge Onion's Practice Commentary to Art. 35.13. I believe the majority misinterpreted both the Practice Commentary and the statute.

■ Art. 35.13 requires only that the state precede the defense in deciding whether to accept *or* challenge a venireperson. The statute explains the challenges may be either peremptory or for cause. I believe this use of the disjunctive in the phrasing of the statute gives trial courts the discretion to permit the exercise of challenges for cause by both sides before moving on to any use of peremptory challenges. This, and not the majority's interpretation, is the "fair, objective meaning of that text" in Art. 35.13. *Boykin v. State*, 818 S.W.2d 782, at 785 (Tex. Cr.App.1991).

■ The trial court complied with Art. 35.13 when it required the state to assert any challenges for cause before appellant and then, after both sides finished their challenges for cause, required the state to present its peremptory challenges before appellant had to decide whether to present any peremptory challenges. Neither the statute, or the Practice Commentary, support the majority's decision that a defendant is entitled to have the last word on all challenges,

to the extent that a defendant's decision to challenge for cause comes only after the State has used both challenges for cause and peremptories on a prospective juror.

I believe the majority's decision will lead to "an absurd result that could not possibly have been intended." Op., at 879; and *Boykin v. State*, at 785. In the individual voir dire of most capital murder trials, the State takes a venireperson on individual voir dire before a defendant and argues challenges for cause as they arise during the voir dire. Trial courts usually permit rehabilitation by the defense before making a ruling on a State challenge for cause. The State waits on its decision whether to use peremptories until voir dire is concluded. The venireperson is then passed to a defendant who follows the same pattern as the State: individual voir dire of the venireperson and requests for challenges for cause as they arise, with the State usually being permitted to rehabilitate, and then waiting until the end of the individual voir dire to exercise a peremptory challenge. After individual voir dire by the parties has been concluded, if a venireperson was not successfully challenged for cause by the State or defense, the trial court might question the venireperson at its own discretion. The venireperson will then be passed to the State at the end to see if they wish to use a peremptory challenge on the venireperson, before a defendant must decide if he will. This has been the usual procedure followed in voir dire of the capital murder cases I have reviewed as a judge on this Court.

The State, as well as the defense, often urges challenges for cause during the course of their individual voir dire as soon as the answers of the venireperson raise the cause for the challenge so that they will not needlessly waste time on that individual voir dire. The State often does not decide whether to use a peremptory until after a defendant has finished his individual voir dire of a venireperson. This is done for the reason that during the individual voir dire of the venireperson by the defense, a venireperson might say something that will give the State reason

to use a peremptory challenge on that venireperson. Within this typical capital voir dire process, the majority's decision today will produce chaos.

To me, it is clearly absurd for us to interpret Art. 35.13 to require the State to exercise its choice whether to peremptorily challenge a venireperson before that venireperson has even been passed to the defense for individual voir dire. The majority's decision today will make this ridiculous scenario the rule in capital voir dire, because it will violate a right of a defendant if the State is permitted to exercise any challenges to a venireperson after that defendant has requested his first challenge for cause of that venireperson. This is the essential type of absurd result that we spoke of in *Boykin v. State.*

I disagree with and do not join the majority's failure to recognize that the trial court acted within its legal discretion when it conducted voir dire in a manner that comported with Art. 35.13.

Because the plurality overrules appellant's eighth point of error, I concur in its judgment to affirm appellant's conviction. With these comments on point of error eight, I otherwise join the opinion of the Court on the remaining points of error.

McCORMICK, P.J., and MILLER, OVERSTREET, and MALONEY, JJ., join this concurrence.

BAIRD, Judge, concurring.

In his eighth point of error, appellant contends the trial judge failed to comply with Tex.Code Crim.Proc.Ann. art. 35.13. Judge Meyers agrees but finds the error harmless. On the other hand, Judge White finds no error. Neither Judge Meyers nor Judge White provide any authority for their respective positions.

We considered a similar issue in *Rousseau v. State,* 855 S.W.2d 666 (Tex.Cr.App.1993). In *Rousseau,*

... Over defense counsel's objection, the trial judge dismissed one of twelve groups of ten venirepersons prior to the individual voir dire of that group, based upon the mistaken belief that he had violated the dictates of Article 37.071(g) V.A.C.C.P., during his introductory remarks to that group.

*Id.,* 855 S.W.2d at 675. In dissent, I reviewed our various voir dire statutes, including art. 35.13, and, like Judge Meyers today, argued the trial judge's "mistake" violated the clear import of those statutes. *Rousseau,* 855 S.W.2d at 689–690 (Baird, J., dissenting). Nevertheless, the majority, without citation to any legal authority, held "the trial court did not abuse its discretion in dismissing the group and ... no error is presented." *Id.,* 855 S.W.2d at 676. At that time, I stated: "Such a broad grant of discretionary authority improperly permits the trial judge to override our legislative provisions concerning the selection of a jury." *Id.,* 855 S.W.2d at 689. "By its actions today, the majority ... permits the trial judge to 'thwart' our laws concerning the formation of a jury. ... Failure to comply with our jury selection statues is now subject to the discretion of the trial judge." *Id.,* 855 S.W.2d at 691.

Were it not for the majority opinion in *Rousseau,* I would join Judge Meyers in finding error in the instant case. However, as *Rousseau* made clear, a trial judge does not err in changing, or even ignoring, the statutory framework concerning voir dire.[1] *Rousseau,* 855 S.W.2d at 676. Consequently, the trial judge in the instant case did not err in not complying with art. 35.13.

For this reason, I join only the judgment of the Court.

MILLER, J., joins this opinion.

CLINTON, Judge, dissenting.

Article 35.13, V.A.C.C.P., is derived from former article 632, C.C.P. 1879; also applicable to capital cases, it provided, *viz:*

---

1. I pause to note that neither the instant case nor *Rousseau,* presented an issue under the Due Process Clause of the Fourteenth Amendment to the United States Constitution or art. I § 19 of the Texas Constitution.

"When a juror has been held to be qualified he shall be passed to the parties, first to the state and then to defendant, for acceptance or challenge."

The same code further contemplated an "examination" of a venire-person relating to a *challenge for cause* was not confined to answers given, in that "other evidence may be heard in support of or against the challenge." *Id.*, article 637; O.C. 577; now Article 35.18.

The *peremptory* challenge, made without assigning any reason therefor, goes back to O.C. 571, which inevitably came from the English common law. See *Knox v. Collins*, 928 F.2d 657, at 660–661 (C.A.5 1991), and cases cited therein.

The statutory order of things remained substantially the same until 1965.* Sometime and somewhere along the way and apparently borrowing from the civil side, the Court sanctioned an "examination" of venire-persons "on their voir dire," and it became accepted practice that parties may seek to glean information enabling them more intelligently to exercise their respective peremptory challenges. See, e.g., *Reich v. State*, 94 Tex.Cr.R. 449, 251 S.W. 1072 (1923), citing civil and criminal cases; *Belcher v. State*, 96 Tex.Cr.R. 561, 258 S.W. 815 (1924); *Kincaid v. State*, 103 Tex.Cr.R. 485, 281 S.W. 855 (1926). Accepting a proposal recommended by the Special Committee for Revision of the Code of Criminal Procedure, the Legislature refined and codified that common practice in Article 35.17 of the 1965 code. See Interpre-

tative Commentary and Special Commentary (common practice of individual examination in certain capital cases now written into statutes).

Therefore, as the majority correctly observes, its construction of Article 35.13 is "neither novel nor new." Slip opinion at 18. This Court recognizes that a trial court has broad discretion "over the course of the voir dire examination," e.g., *Earhart v. State*, 823 S.W.2d 607, at 623 (Tex.Cr.App.1991). Yet, it also has discerned that the statute on its face and in practice is beneficial to capital defendants in respects not accorded other defendants, not the least of which is that the former *"do not have to exercise a peremptory strike against a particular venireman until the State has first decided whether to do so."* *Janecka v. State*, 739 S.W.2d 813, at 834 (Tex.Cr.App.1987). It follows that should the State accept the venireperson, in turn the defendant may then opt to accept or exercise challenges. Accordingly, the Court fairly consistently resisted "corruption of the peremptory strike practice" through innovative departures from the statutorily prescribed order of exercising challenges, either for cause or peremptorily. *Ibid.* See, e.g., *Grijalva v. State*, 614 S.W.2d 420, at 424 (Tex.Cr.App.1980); *Pierson v. State*, 614 S.W.2d 102, at 107 (Tex.Cr.App.1980); cf.; *Bridge v. State*, 726 S.W.2d 558, at 563–564 (Tex.Cr.App.1986); see also *McClain v. State*, 432 S.W.2d 73, at 75 (Tex.Cr.App.1968) (by virtue of 1967 amendment Article 35.13 applicable only to capital cases), and authorities cited therein.

---

* The 1925 code outlined initial statutory steps for forming a capital jury, each of which may be traced back through the 1911 and 1895 codes to the 1879 code or the Old Code, summarized as follows.

When the case is going to trial the names of the summoned jurors shall be called [and seated]. Article 602 [now 35.01]. Those present shall then be sworn to answer questions touching on their service and qualifications. Article 603 [35.02]. The court shall then hear and determine excuses, and if the court deems it sufficient, the juror shall be discharged. Article 604 [35.03, § 1]. [Provisions for claiming exemption and challenging array omitted]. The court shall then proceed to try the qualifications of those present who were summoned to serve as jurors in the mode prescribed. Article 611–612 [35.10,

35.12]. When such juror is held qualified, he shall be *first passed to the state, and then to the defendant, for acceptance or challenge, either peremptory or for cause.* Article 613 [35.13]. A peremptory challenge is made without assigning any reason therefor. Article 614 [35.14]. [Provisions of reasons and procedure for challenges for cause omitted]. After proper examination the judge shall decide all challenges without delay and argument. Article 621 [35.21].

See, e.g., *Bizzell v. State*, 72 Tex.Cr.R. 442, 162 S.W. 861, at 862 (1914). Former statutes did not expressly provide for voir dire for purposes of making peremptory challenges, but as shown *post* such inquiries developed into a general practice that would become a statutory entitlement upon demand under the present code.

For these additional reasons and with such further observations, I agree that the trial court erred in imposing a regimen for voir dire in a capital case in direct contravention of the legislative mandate of Article 35.13 (qualified juror *shall* be passed for acceptance or challenge etc.). But I can not accept the strained exercise by the Court to justify its saying an error of such fundamental character and nature in selecting a jury to try a capital case is harmless.

Because this Court above all others should not make excuses for and thereby approve "innovative" departures from that which the Legislature commands in cases where the life of a citizen is at stake, I respectfully, stoutly dissent.