

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-12-00077-CR

_____

SHANNON MARK BATTEE, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 115th District Court
Upshur County, Texas
Trial Court No. 15,658

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

## MEMORANDUM OPINION

In midsummer 2010, the admittedly mentally ill Shannon Mark Battee fled a Gilmer grocery store parking lot in his green truck, with police officer Larry Sewell pursuing in a marked police vehicle. In a bench trial, Battee was convicted of felony evading arrest and was sentenced to ten years' confinement.[1] *See* TEX. PENAL CODE ANN. § 38.04.[2] On appeal, Battee seeks reversal based on an allegedly improper waiver of his right to be tried by a jury and the denial of his insanity claim. We affirm the judgment of the trial court because (1) the lack of a written waiver of a jury was harmless error and (2) sufficient evidence supports the trial court's rejection of Battee's insanity defense.

Although not relevant to Battee's appellate issue on jury waiver, a summary of the evidence will provide the context of the offense and be helpful for discussing his insanity point.

Officer Sewell was called to a local Brookshire's parking lot July 15, 2010. Sewell said there had been some offense at the same location a couple of days before, and he was responding to a report that the same involved person was again present at the parking lot. Sewell recognized a green truck from the prior incident. The truck left the parking lot and sped away. Sewell said he pursued the truck for about fifteen to sixteen miles at speeds of beyond 100 miles per hour.

---

[1] The trial court found that a deadly weapon, the vehicle, was used or exhibited in the course of the offense, thus enhancing the range of punishment. *See* TEX. PENAL CODE ANN. § 12.35(c)(1) (West Supp. 2012).

[2] *See* Act of May 27, 2009, 81st Leg., R.S., ch. 1400, § 4, 2009 Tex. Gen. Laws 4385, 4386 (current version at TEX. PENAL CODE ANN. § 38.04 (West Supp. 2012)).

This testimony is corroborated by a video recorded from the dash of Sewell's police vehicle.[3] Consistent with Sewell's description of events, Battee, later identified as the truck's driver, can be seen passing vehicles on the right shoulder, driving in the center turn lane, and driving in the opposite lanes, i.e., driving into oncoming traffic. At one point, Battee pulled into the parking lot of a truck stop, slowed, and stopped. Almost immediately, and after Sewell opened the door of his car but before he exited, Battee sped away again. In the course of the chase, one police car with lights flashing passed Battee in the oncoming lane; another car, also with lights flashing, pulled onto the shoulder on Battee's side of the road, facing Battee; and a third police car, lights flashing, passed Sewell and overtook Battee around the time Battee swerved from side-to-side on the four-lane highway and finally came to a stop. Battee finally was slowed and pulled to the left shoulder facing oncoming traffic. Before the vehicle came to a complete stop, the driver side door was seen to be open. As the vehicle rolled to a stop, Battee leapt from the truck and ran into a field. Sewell said that, though it could not be clearly seen in the video recording, Battee jumped from the truck while it was still moving. Sewell gave pursuit and eventually apprehended Battee.

In his testimony, Battee said that he ran from the vehicle because he smelled gas and feared an explosion and that, when he realized Sewell was behind him, he "just put [his] hands up and went with them." Sewell, though, said he had to chase Battee for thirty to a hundred yards, and Battee did not willingly cease running from him.

---

[3]The video recording introduced into evidence is formatted to contain data next to the video, and this data shows the police cruiser's speed and other information.

*(1)      The Lack of a Written Waiver of a Jury Was Harmless Error*

Under Texas law, a criminal defendant, except one against whom the death penalty is sought, may waive his or her right to a jury trial; but such waiver must be in writing and made in person, with the consent of the trial court and State. TEX. CODE CRIM. PROC. ANN. art. 1.13(a) (West Supp. 2012). Battee correctly notes that the record does not include a written waiver of jury trial. Battee claims that the absence of such a formal waiver and the lack of trial court admonishments regarding waiver warrant reversal of the conviction.

Certainly, failure to comply with Article 1.13(a) is error. *Johnson v. State*, 72 S.W.3d 346, 348–49 (Tex. Crim. App. 2002); *Lopez v. State*, 71 S.W.3d 511, 513–14 (Tex. App.—Fort Worth 2002, no pet.). While the record reveals no written waiver of a jury, there are some references indicating Battee's actual waiver of a jury. At the beginning of the bench trial, the trial court stated, "[F]or housekeeping purposes on April 16th Mr. Battee waived his right to a jury but we've not -- has he -- he hasn't been arraigned . . . ." Neither Battee nor his attorney contested this statement. The trial court's docket sheet contains an entry dated April 16, 2012, stating that the defendant waived his right to a jury trial. When Battee was on the stand, his attorney asked him the following question, eliciting the quoted responses:

> Q.      . . . . You, Shannon, the question I do need to approach with you, you know, you said you didn't really understand whenever you waived a jury, that you said that I was filing that not guilty by reason of insanity thing, okay. Do you understand why I'm doing that?
>
> A.      Why you waived the jury?

4

Q.    No.

A.    I mean, why you said plea insanity.

The discussion then concerned whether Battee wanted to plead not guilty by reason of insanity and the reasons for such a plea. There was no suggestion at all that Battee did not acquiesce in, or intend to effect, a waiver of his right to a jury trial. Finally, the trial court's judgment is titled "Judgment of Conviction by Court–Waiver of Jury Trial."

The situation before us is controlled by the reasoning in *Johnson*. There, the absence of a formal waiver of jury trial was found to be error. *Johnson*, 72 S.W.3d at 347. Because the error concerned a violation of a statutory right, the issue was subject to a harmless error analysis under Rule 44.2(b) of the Texas Rules of Appellate Procedure. *Id.* at 348; TEX. R. APP. P. 44.2(b). To determine whether Johnson's substantial rights were affected by the violation of Article 1.13(a), the court looked to "ascertain whether he understood his right to trial by jury before his bench trial began." *Id.* at 349. In *Johnson*, as here, there was no allegation that Battee did not know about his right to a jury trial. *Id.* The *Johnson* court also cited the judgment in that case, which said Johnson had waived his right to a jury. Here, the judgment's title and the trial court's docket sheet state a jury was waived, and the waiver was discussed in open court with the defendant and his attorney present. There was no claim of surprise or disagreement regarding the waiver. A recitation of a waiver of jury trial is "binding in the absence of direct proof of [its] falsity." *Id.* (quoting *Breazeale v. State*, 683 S.W.2d 446, 450 (Tex. Crim. App. 1984) (op. on reh'g)). The *Johnson* court reasoned that, because "waiver" requires knowledge of the right being waived, and because, lacking any evidence that Johnson did not know of his right to a jury,

5

he must have known of such a right and therefore waived it, as evidenced by the recitation of that fact in the judgment. Similarly, there is nothing here to contradict the statements in the court's docket sheet, judgment, and references in the trial proceedings that Battee did not know about his right to a jury and waived that right. As in *Johnson*, "although Art. 1.13 was violated," the appellant "was not harmed by the violation because the record reflects that he was aware of his right to a jury trial and opted for a bench trial." *Id.*

Although Article 1.13(a) was violated, the error did not affect Battee's "substantial rights" and is, therefore, harmless. We overrule this contention of error.[4]

*(2) Sufficient Evidence Supports the Trial Court's Rejection of Battee's Insanity Defense*

Battee also contends that the "evidence is insufficient to support Appellant's conviction as indicted because he was insane at the time that the offense occurred." Insanity is an affirmative defense, which must be proved by a preponderance of the evidence. TEX. PENAL CODE ANN. §§ 2.04, 8.01 (West 2011). A defendant asserting an insanity defense must prove by a preponderance of the evidence "that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." TEX. PENAL CODE ANN. § 8.01(a). Whether the defense of insanity was proved is a decision that lies within the province of the jury (or, as here, the judge as sole fact-finder), not only as to the credibility of witnesses and the weight of the evidence, but also as to the limits of the defense. *Bigby v. State*, 892 S.W.2d 864, 878 (Tex. Crim. App. 1994). When we review the fact-finder's rejection of an

---

[4]In his brief, Battee also complains that the record contains no admonishment from the trial court regarding the perils of waiving a jury trial. Battee offers no authority establishing that such admonishments are required. If he is referring to the admonishments in Article 26.13, that statute applies to pleas of guilty and is not applicable here. *See* TEX. CODE CRIM. PROC. ANN. art. 26.13 (West Supp. 2012).

insanity defense, we must determine whether the finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Id.* at 875.

Evidence was introduced that Battee had been hospitalized for mental illness at least four times since 1995. The State presented testimony from a psychologist, Dr. Thomas Allen, who testified that his evaluation of Battee indicated a mood disorder, which Allen called bipolar disorder, and not "a formal thought disorder like schizophrenia." Allen diagnosed Battee as having severe mental illness, but found him to have been legally sane at the time of leading Sewell on the high-speed chase. On the other hand, Battee presented Dr. Frank Murphy, a psychiatrist, who diagnosed Battee as suffering from schizophrenia,[5] rather than bipolar disorder.

Battee's expert, Murphy, said he had known Battee since 2005. In his written report, Murphy said he treated Battee until November 2006. In making his distinction between bipolar disorder and schizophrenia, Murphy testified that persons suffering from bipolar disorder suffer episodes of manic behavior, but treatment or time allow that person to "go[] back to their level of functioning before the episode occurs." Battee, though, exhibited "negative symptoms" even between "episodes of mania." As an example, Murphy pointed out Battee's flat affect at trial, which Murphy did not attribute to malingering. Murphy concluded, "[A]t the time of the alleged

_____

[5]Although not mentioned in Murphy's report, Allen's report states that Battee told Allen he was currently prescribed Risperdal and had previously taken Abilify. Risperdal and Abilify are medications used to treat schizophrenia. *See AHFS Consumer Medical Information, Risperidone*, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000944/ (last visited Dec. 11, 2012); *AHFS Consumer Medical Information, Aripiprazole*, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000221/ (last visited Dec. 11, 2012).

offense, [Battee] was under the influence of a severe mental illness or defect, and was not aware that the conduct of which he is accused was wrong."

The two testifying experts diverged in their opinions of Battee's actions resulting in this indictment. Murphy said he believed Battee when he said he was not trying to escape prosecution when he ran from the police; Murphy also said Battee's fleeing from police was irrational. Battee told Murphy he did not know he was being pursued and was hurrying to town for a meeting and to get his truck fixed.[6] Murphy did say, though, he could offer no explanation for Battee's stopping at the parking lot, then driving away after seeing Sewell, other than it was an attempt to evade the officer.

Murphy based his opinion, at least in part, on the fact that Battee had a bachelor's degree in criminal justice. Murphy said Battee's

> pattern of crimes[7] is not a pattern of someone who carefully thinks out crimes and commits them with the intention of escaping prosecution . . . he's an intelligent fellow . . . it just doesn't make sense if he were premeditating these acts that they would be so poorly thought out and -- and the gain, the financial gain be so little.

There had been testimony that Battee received a bachelor's degree in 1995. Over the years, he had had at least two confrontations with law enforcement, where he had evaded or run from them, and at least one of these events involved use of a vehicle.

---

[6]In cross-examining Murphy, the State suggested Battee had been a suspect in thefts and assaults in the two days before the incident in question, but no testimony was offered supporting this assertion.

[7]Battee's mother, Norma Kincaid, testified to his prior confrontations with law enforcement. She said that, in 2003, he had been arrested for fleeing from police; in or around 2007, there was an incident where "we was driving slow and the cops were behind him." Including these events, there were three or four occasions where Battee experienced "manic episodes," according to his mother, and police were involved.

The trial court itself questioned Murphy, pointing out that, in the chase video recording, Battee used turn signals to indicate lane changes. The court said this

> would indicate that he saw the police officer and the lights flashing and the vehicle that was pursuing him . . . . Do you think that Mr. Battee is so delusional that he -- well, obviously he -- he has some understanding of the laws, the traffic laws because he's using his blinkers as he's turning lanes.

Murphy had no clear opinion as to what the use of signals might mean. The court stated that, based on its view of the driving and signaling behavior in the video, this conduct "indicate[d] . . . he might have known he was being pursued."

Rachel Harrington interviewed Battee shortly after his arrest. Harrington had a bachelor's degree in social work and a master's degree in rehabilitation counseling. In her employment with Community Health Corporation, she evaluated Battee in jail after his arrest and recommended hospitalization. She described Battee, in the hours after arrest, as "extremely delusional," and not oriented as to why he was in jail. Battee, though, according to Harrington, was convinced he would be released in two weeks at precisely 2:00 p.m. to tend to his mother and matters on her land. Later in her testimony, Harrington described Battee in their post-arrest interview as "very delusional," "hostile," and "clearly was not in the right state of mind." These observations led Harrington to recommend hospitalization.

Kincaid described his history of strange behaviors, such as calling her in rapid succession and either hanging up or asking what she was doing then hanging up;[8] saying "irreverent things"; pacing; and punching holes in walls to kill imaginary animals. She described an incident where

---

[8]When asked about these telephone calls, Battee said he did not recall the events.

9

Battee drove her truck, then apparently locked the door to the house, thus preventing Kincaid from getting in to use the telephone. Kincaid said she had learned to just leave Battee alone when he started exhibiting these extreme behaviors. After the hospitalization following the instant offense, Kincaid testified that Battee had been "better," was on unspecified medications, and had had no further "episodes."

Battee took the stand and confirmed his history of prior hospitalizations as well as his bachelor's degree and previous employment as a guard in Dallas and Gregg Counties. He explained the chase by saying the speedometer on his truck had been malfunctioning and he was driving at high speeds to get the meter to "kick in." Regarding the momentary stop in the parking lot, he said he did not know there was a law enforcement officer there. When Battee finally pulled over, he said he smelled gas, which led him to run away from the vehicle.

The trial court found that, while Battee suffered mental illness, he also knew that speeding, driving in the wrong lanes, and running from police were wrong. "The issue of insanity at the time of the offense lies within the province of the [fact-finder], and we will overturn its decision only where insanity is undisputed or resolved to one end of the spectrum outside the realm of discretion." *Reyna v. State*, 116 S.W.3d 362, 367 (Tex. App.—El Paso 2003, no pet.) (citing *Bigby*, 892 S.W.2d at 878). It cannot be said that the trial court's judgment is so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Meraz v. State*, 785 S.W.2d 146, 155 (Tex. Crim. App. 1990).[9] While both examining doctors

---

[9]Judge Cochran's concurrence in *Brooks v. State*, 323 S.W.3d 893, 924 n.67 (Tex. Crim. App. 2010) (Cochran, J., concurring), suggests that the standard in *Meraz*, 785 S.W.2d at 154, is still the appropriate review where a defendant had the burden of proof on an affirmative defense. *See also Johnson v. State*, No. 05-09-00133-CR, 2010

10

agreed Battee suffered from mental illness, they differed on the subject of Battee's sanity at the time of the offense. The trial court was able to view, and weigh the credibility of, those experts and Battee himself. The court was free to ascribe whatever weight it deemed appropriate to the various bits of evidence, which included a video recording of the offense, as well as the opinions of the witnesses. Based on all the evidence, the trial court could conclude that Battee failed to prove by a preponderance of the evidence that he did not know, because of severe mental disease of defect, that his conduct was wrong. *See* TEX. PENAL CODE ANN. § 8.01(a). We overrule this contention of error.

We affirm the trial court's judgment and sentence.


Josh R. Morriss, III
Chief Justice


Date Submitted:     November 26, 2012
Date Decided:       December 19, 2012

Do Not Publish

---

Tex. App. LEXIS 10051 (Tex. App.—Dallas Dec. 20, 2010, no pet.) (not designated for publication) (finding *Meraz* still applies post-*Brooks* to review affirmative defense). We cite *Johnson* not for any precedential value but simply note it as we continue to discover the post-*Brooks* landscape. *See Brooks*, 323 S.W.3d at 912 (finding "no meaningful distinction" between standards of review in *Jackson v. Virginia*, 443 U.S. 307 (1979), for legal sufficiency of evidence, and *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996), for factual sufficiency of evidence).