

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-14-00126-CR

Joel Price **MORRIS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 216th Judicial District Court, Kendall County, Texas
Trial Court No. 5226
Honorable N. Keith Williams, Judge Presiding

Opinion by:    Patricia O. Alvarez, Justice

Sitting:       Marialyn Barnard, Justice
               Patricia O. Alvarez, Justice
               Jason Pulliam, Justice

Delivered and Filed:  August 12, 2015

AFFIRMED

Appellant Joel Price Morris was charged by indictment with the murder of Robert Morris. The jury found Morris guilty and assessed punishment at life imprisonment in the Institutional Division of the Texas Department of Criminal Justice.  In his sole issue on appeal, Morris contends that, when viewed in a neutral light, the evidence of his insanity so greatly outweighed the State's contrary evidence that the verdict is manifestly unjust.  We affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     Morris's Psychological History

Morris suffered from psychotic delusions and was hospitalized on nine separate occasions between 2008–2010.  Psychiatrists at trial disagreed on Morris's specific diagnosis.  They did, however, agree that Morris developed an unsubstantiated belief that his father implanted devices in his body which allowed his father to electrocute him and monitor his behavior.

In 2008, Morris was employed at his father's used car business until an employee alerted Morris's parents to a change in his mental condition.  Soon after, Morris attacked his father.  Morris was hospitalized, and Morris's parents obtained a protective order against him.  In 2009, his family and friends staged an "intervention" in an attempt to convince Morris to voluntarily seek mental health treatment.  During the following year, Morris entered treatment, violated his protective order, was incarcerated, and was hospitalized again after he attempted to gouge his eye out while in custody.  At each mental health facility, Morris was medicated and reacted appropriately.

In early 2011, Morris walked into the sheriff's office in Boerne, Texas in an effort to report his father.  Morris told Deputy Roger Baker that his father implanted a microchip in his head and had sexually assaulted him as a child.  Deputy Baker testified that although he felt Morris "believed what he was [saying] happened," the conversation abruptly ended when Morris "got mad and jumped up and ran out of the office."  After speaking with Baker, Morris confided in a relative; "He told me he was going to kill his father. . . . He said, 'If the law doesn't take me serious, I'm going to kill him myself.'"

### B.     The Day of the Shooting

On April 1, 2011, Morris contacted his parents, Claudia and Robert Morris, to arrange a visit.  His parents agreed for Morris to join them for Sunday lunch at their home.  On April 3, Morris arrived and immediately inquired as to his father's whereabouts.  Morris briefly left to

retrieve an item from his vehicle, and his mother testified Morris returned with "a very determined look on his face. . . . [W]hen he turned the corner in the kitchen, I saw that he had behind his back a gun [sic]." His mother yelled, "Run, Bob, he's got a gun." Before his mother could intervene, Morris shot his father eight times and ran. Morris returned minutes later and shot his father three more times.

Morris fled the scene in his vehicle. With police in pursuit, Morris attempted to discard his weapon. Morris was apprehended without incident a short distance from where his weapon was retrieved. After his arrest, Morris made statements to law enforcement acknowledging his guilt.

## C. Expert Testimony at Trial

At trial, Morris asserted the affirmative defense of insanity. The testimony and exhibits established the following:

### 1. *Defense Expert: Dr. Brian Skop*

Morris's expert witness, psychiatrist Dr. Brian Skop, testified Morris was a paranoid schizophrenic who introduced himself as "Jesus Christ, . . . ready to go to the next galaxy." According to Dr. Skop, Morris believed he had deciphered "coded material from his true father," which revealed his known father was his stepfather, "an evil god that was implanting devices into people and blackmailing people to control them as part of a secret society for the Masons."

Prior to evaluating Morris, Dr. Skop reviewed Morris's mental health records, medical history, police reports, and video-taped interviews with police. Dr. Skop testified the documents he reviewed reinforced his expert opinion that Morris suffered from Schizoaffective Disorder. "[M]any of [Morris's] delusions were referenced in that interview [with police]. . . . In almost all those hospitalizations[,] [Morris] had had similar delusions about being raped by his father continually, about his father implanting devices that were electrocuting him and monitoring his

behavior." Dr. Skop explained Morris's motive to kill his father stemmed from "his mental disease" which was a cause of his previous hospitalizations.

On direct examination, when asked if he had an opinion as to whether Morris believed his actions were wrong when he shot his father, Dr. Skop opined, "I don't believe that he knew what he was doing was wrong. I think he thought it was morally correct."

However, when pressed by the State during cross-examination, Dr. Skop acknowledged Morris likely knew his actions were illegal. The State clarified Dr. Skop's distinction between morally wrong and legally wrong.

| | |
|---|---|
| State: | And just to be clear, you're interpreting in a moral sense? |
| Dr. Skop: | Yes, because it's a divine spiritual [morally wrong]. To me that trumps legal[ly wrong]. |
| | . . . . |
| Dr. Skop: | Well, I think there's evidence that he knew it was illegal. I wouldn't say necessarily wrong, again from my perspective, but illegal, knowing that he would be arrested. |
| State: | Okay. We can use your term then, that he knew his conduct was illegal. |
| Dr. Skop: | Yes, that's fine. He knew he was going to be arrested, that he was—like I think when they asked for DNA samples, he basically said, "Why are you doing it? It's a slam. You know, basically, it's a slam dunk case, you know. I shot the guy. I'm telling you I shot the guy," so that he was aware of the nature of his actions. |

### 2. State Expert: Dr. Robert Cantu

The State's rebuttal witness, psychiatrist Dr. Robert Cantu, also reviewed Morris' mental health and medical records before meeting with Morris. Dr. Cantu reinforced Dr. Skop's opinions concerning Morris's ability to understand his actions were legally wrong.

> Well, if you look at the—I believe it was the Austin State Hospital records, there is a comment that he makes in there that he needs to contact the President so that he can get a pardon before he goes to kill his father. So again, if you're not doing anything wrong, why would you need a presidential pardon before you did it?

. . . .

> If you look at the events immediate to the act, one of the things Mr. Morris told me he did is he put his gun unloaded into the trunk. And I said—I asked him, "Why did you do that?" And he said, quote, "So I wouldn't get in trouble," unquote. And then when he—again looking at the record when it talks about how he approached the house and went into the house with his gun, a couple of different sources talk about how he put the gun behind his back as he passed his mother. Again, if you're not doing anything wrong, why would you hide your gun from your mother?

> As he's—as he's leaving—after he leaves, after the act is completed, when he sees the policeman coming the opposite direction, he throws his gun out the window—or, actually, he threw it over the roof of the car. And I asked him, "Well, why did you do that?", and he said, "The sheriff passed me, and I threw the gun out so he wouldn't shoot me." Again, if you didn't think you were doing anything wrong, why would the sheriff shoot you? . . . And then the only other—one other thing, as he was driving to Boerne from San Antonio, he told me, "I made sure that I drove the speed limit the whole way." "Why?" "So that I wouldn't get in trouble." Again, just one more piece, at least for me.

Both psychiatrists agreed that Morris's recurring actions and hospitalizations were a direct result of Morris's "strong conviction that his father . . . implanted devices into his body to both monitor him and torture him." However, unlike Dr. Skop, Dr. Cantu was reluctant to diagnose Morris as Schizophrenic, diagnosing him instead with a "Psychotic Disorder Not Otherwise Specified." Dr. Cantu opined that Morris's illness did not "quite fit into a nice, neat category."

### 3. Additional Evidence

At trial, the jury also heard testimony from law enforcement and detention center personnel. Officers who came in contact with Morris testified to his emboldened statements about killing his father, erratic ramblings concerning his ongoing paranoia, and Morris's violent behavior directed to select detention officers, which subsided only after medication was administered. Philip Lopez, a detention officer who first met Morris during Morris's 2009 incarceration for violating a protective order, testified Morris was initially very docile. Morris's demeanor "gradually changed," and Morris began "throwing anything" that was not "bolted down to the room." Lopez said, "in [Morris's] mind[,] he believed that some of the staff [were] trying to poison

him."  Detention officer Emelio Perada, who also knew Morris from Morris's previous incarceration, testified Morris told him, "'You don't have to worry about me, Perada.  I killed the son of a bitch that I had to.'"

On January 10, 2014, the jury found Morris guilty of murder with a deadly weapon and sentenced him to life in prison.  Morris now appeals, arguing the evidence of his insanity, when viewed in a neutral light, so greatly outweighed the State's contrary evidence.

### AFFIRMATIVE DEFENSE OF INSANITY

**A.**     **Insanity and the Burden of Proof**

Texas law presumes a criminal defendant "intends the natural consequences of his acts," and the defendant is only absolved from criminal responsibility if he proves the affirmative defense of insanity.  *Ruffin v. State*, 270 S.W.3d 586, 591–92 (Tex. Crim. App. 2008); *see also Brown v. State*, 04-12-00813-CR, 2014 WL 3747234, at *4 (Tex. App.—San Antonio July 30, 2014, no pet.).  A defendant asserting the affirmative defense of insanity bears the burden to prove, by a preponderance of the evidence, "that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong."  TEX. PENAL CODE § 8.01(a) (insanity); TEX. PENAL CODE § 2.04 (affirmative defense); *see also Meraz v. State*, 785 S.W.2d 146, 150 (Tex. Crim. App. 1990).

The existence of a mental disease does not ipso facto establish *legal* insanity.  *Ruffin*, 270 S.W.3d at 592.  The disease must have precluded the defendant *from knowing his conduct was wrong*.  *Id.*; *see also Witty v. State*, 171 S.W. 229, 232 (Tex. Crim. App. 1914) (instructing the jury that the insanity must have "controlled the will" and taken away the "freedom of moral action" in order to justify a homicide).  Importantly, in the context of an insanity defense and associated conduct, Texas courts equate the word "wrong" with "illegal."  *Ruffin*, 270 S.W.3d at 592 (citing *Bigby v. State*, 892 S.W.2d 864 (Tex. Crim. App. 1994)).  A defendant may believe his conduct is

morally justified, but if a defendant knows that his conduct is "illegal," then he understands his conduct is "wrong."  *Id.* at 592, n. 17 (citing *Bigby*, 892 S.W.2d at 864).

### 1.  *Bigby v. State*

Courts consider a defendant's actions prior to, during, and following a crime as evidence of a defendant's cognizance that their conduct was wrong.  *Id.*; *accord Bigby*, 892 S.W.2d at 877. In *Bigby*, the defendant suffered from a severe mental disease.  *Bigby*, 892 S.W.2d at 874.  Bigby believed he was being electronically monitored when he killed his friend and friend's sixteen-month-old child.  *Id.*  Five psychiatric professionals testified at trial, and "[w]hile several of appellant's experts testified that appellant could not or did not know his conduct was wrong, several did testify that appellant knew his conduct was illegal."  *Id*. at 876–77.

The *Bigby* court held that neither the extensive evidence of delusions nor the defendant's deep-seeded belief that he was morally justified resolved the question of "legal" sanity.  *Id.* at 878. Rather, the question of sanity was resolved by evidence, such as the defendant's confession to police, indicating the defendant knew others believed his conduct was wrong.  *Id.*; *see also Aschbacher v. State*, 61 S.W.3d 532, 535 (Tex. App.—San Antonio 2001, pet. ref'd) (discussing a non-exhaustive list of factors a fact-finder may consider in assessing the issue of insanity: "the person's demeanor before and after the offense, any attempts to evade police or to conceal incriminating evidence, a person's expressions of regret or fear of the consequences of his or her actions, and possible motives for the offense.").

### 2.  *Aschbacher v. State*

As in *Bigby*, the defendant in *Aschbacher* suffered from a delusional disorder.  *Aschbacher*, 61 S.W.3d at 534.  Aschbacher killed an individual who he believed was "monitoring his activities for the purposes of having him killed."  *Id*.  Three defense experts testified Aschbacher was "unable to appreciate the wrongfulness of his conduct."  *Id*. at 536.  The appellate court looked to the

State's expert witness testimony, evidence of Aschbacher's attempted disposal of the murder weapon, and Aschbacher's unprovoked confession to a witness at the scene that he had shot the victim. *Id.* The court ultimately held that "although [Aschbacher's] conduct before the murder was somewhat strange, his actions during and immediately following the killing indicate Aschbacher knew his conduct was wrong." *Id.* at 537.

Despite the existence of controverting evidence regarding Aschbacher's ability to distinguish right from wrong, the court maintained the jury "reasonably could have resolved the conflicting evidence regarding legal insanity against Aschbacher." *Id.*; *see also Bigby*, 892 S.W.2d at 877; *see also Roybal v. State*, 04-02-00647-CR, 2003 WL 22241629 (Tex. App.—San Antonio Oct. 1, 2003, no pet.) (evidence that a schizophrenic defendant attempted to discard the knife and had to be physically restrained following a stabbing was sufficient to support a jury finding that the defendant was not insane).

### B.    Factual Sufficiency Review

On evaluating the sufficiency of the evidence on Morris's affirmative defense of insanity, the appellate court utilizes a factual sufficiency review to determine if, after considering all the relevant evidence, the judgment was "so against the weight and preponderance of the evidence as to be clearly wrong and manifestly unjust." *Meraz*, 785 S.W.2d at 155; *see also Gallo v. State*, 239 S.W.3d 757, 770 (Tex. Crim. App. 2007) (discussing the standard of review when the proponent bears the burden of proof by a preponderance of the evidence).

Unlike the expert testimony in *Aschbacher*, here the experts agreed that Morris knew the difference between right and wrong. Morris's expert witness, Dr. Skop, testified to the moral confines to which Morris genuinely believed he conducted himself within; but, Dr. Skop agreed that Morris understood the illegality of his actions. Dr. Skop's characterization of Morris's comprehension of his own conduct as "illegal" rather than "wrong" does not preclude a finding

that Morris knew his conduct was "wrong." *See Ruffin*, 270 S.W.3d at 592 (moral resolves do not excuse illegal conduct, and to understand conduct is illegal is to understand the same conduct is wrong); *Bigby*, 892 S.W.2d at 876–77 (same).

Further, both expert witnesses identified factors evidencing Morris's acknowledgement that his conduct was illegal, including: his resolve to find a legal channel to prosecute his father for his alleged crimes, his efforts to avoid police detection in route to his parent's home by maintaining the speed limit, his attempt to discard the weapon while police were in pursuit, and his comments to law enforcement after his arrest.

According to both experts, Morris understood illegal actions bore legal consequences. And, although Morris exhibited disturbing behavior caused by his severe mental disorder, a jury could reasonably believe that Morris's actions before, during, and immediately following the killing indicate he knew his conduct was legally wrong. *See Aschbacher*, 61 S.W.3d at 536–37.

## CONCLUSION

After considering all the relevant evidence, we cannot conclude that the jury's rejection of Morris's insanity defense is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Meraz*, 785 S.W.2d at 155. Accordingly, we overrule Morris's sole issue on appeal and affirm the trial court's judgment.

Patricia O. Alvarez, Justice

DO NOT PUBLISH